U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



_____
**United States Bankruptcy Judge**

**Signed February 03, 2011**

_____

```
            IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION


IN RE:                          §
                                §
ROBERT WARREN JONES,            §    CASE NO. 08-36014-SGJ-7
     DEBTOR.                    §
                                §
_____§
TIFFANY MULLEN AND              §
MIKE MULLEN,                    §
     PLAINTIFFS,                §
                                §
v.                              §    ADVERSARY NO. 09-03051-SGJ
                                §
ROBERT WARREN JONES,            §
     DEFENDANT.                 §
```

### MEMORANDUM OPINION[1] IN SUPPORT OF: (A) JUDGMENT OF NONDISCHARGEABLE DEBT OWED BY DEBTOR TO TIFFANY MULLEN, PURSUANT TO 11 U.S.C. § 523(a)(4); AND (B) SEPARATE JUDGMENT THAT DEBTOR SHOULD BE DENIED HIS GENERAL DISCHARGE PURSUANT TO 11 U.S.C. §§ 727(a)(2)(A) AND 727(a)(4)(A)

_____

[1] This memorandum opinion constitutes the court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052, rendered after an eight-day trial ("Trial") held in the above-referenced adversary proceeding ("Adversary Proceeding"). At the Trial, the court heard testimony from twelve witnesses and admitted hundreds of documents. Where appropriate, a finding of fact should be construed as a conclusion of law and _vice versa_.

## I.   INTRODUCTION

This Adversary Proceeding was brought jointly by two Plaintiffs.   Both Plaintiffs urge that the above-referenced Defendant, a Chapter 7 debtor, should be denied his general discharge, pursuant to Sections 727(a)(2), (4), or (5) of the Bankruptcy Code.   One Plaintiff additionally urges that her claim should be specifically excepted from discharge pursuant to Section 523(a)(4) of the Bankruptcy Code.[2]

The Plaintiffs are:  (a) Mike Mullen, a sophisticated Dallas businessman, with significant personal wealth and access to capital markets ("Mr. Mullen"); and (b) Tiffany Mullen, the former wife of Mr. Mullen, who is a beautiful, former model, and resides in Aspen, Colorado (the "Ex-Mrs. Mullen").   The Defendant/Debtor in this matter is Robert Warren Jones (the "Debtor"), who is a charismatic makeup artist and hair stylist of some celebrity—having published several books and appeared on various TV shows such as NBC's *Today Show*.

The Ex-Mrs. Mullen first became acquainted with the Debtor through her modeling career.   Eventually, Mr. Mullen and the Ex-Mrs. Mullen decided, prepetition, to embark upon a business venture with the Debtor known as Simple Beaute, Ltd. ("Simple Beaute").   Simple Beaute was formed as a Texas limited partnership in 2001,

---

[2] A claim under Section 523(a)(2) of the Bankruptcy Code was also pleaded as a basis for nondischargeability by such Plaintiff in this Adversary Proceeding but, for reasons that will be later explained, this statute does not provide a basis for relief for her in this litigation.

and was primarily intended to sell DVDs and instructional books (full of glossy pictures and explanatory text) that would teach women how to properly apply cosmetics.[3] Mr. Mullen ultimately made a loan to Simple Beaute, and the Debtor personally guaranteed that loan; approximately $250,000 of unpaid interest remains due and owing on such loan. While the Debtor offered some testimony suggesting that the interest on such loan may have been orally forgiven by Mr. Mullen, this court has concluded that Mr. Mullen is, in fact, a creditor of the Debtor.[4] The Ex-Mrs. Mullen's creditor-status *vis-a-vis* the Debtor was more ambiguous than Mr. Mullen's, prior to the presentation of all the evidence.

The Ex-Mrs. Mullen was actually a 38.61% limited partner of Simple Beaute, and also provided gratuitous modeling services for the photography layouts in the Simple Beaute books (as well as some limited, gratuitous consultation to the Debtor at the early stages of Simple Beaute). The Ex-Mrs. Mullen has filed a proof of claim (and taken the position in this Adversary Proceeding) that the Debtor—as a director, officer, and 51% owner/controller of the ***corporate, managing general partner*** of Simple Beaute, Beaute Management, Inc. (the "Corporate GP")—committed fraud or

---

[3] Simple Beaute also eventually sold makeup application (*e.g.,* brushes) and organizational products.

[4] Mr. Mullen actually obtained a partial summary judgment in a state court action prepetition, in the amount of $175,478.34, against the Debtor, representing Mr. Mullen's claim through January 1, 2006, but the state court judge reserved for trial the amount of indebtedness (interest and attorney's fees) accruing subsequent to such date.

defalcation while acting in a fiduciary capacity and otherwise breached fiduciary duties owed to the Corporate GP and to Simple Beaute, and she, as an equity owner of these entities, can derivatively assert a claim on their behalves and on behalf of herself individually against the Debtor. The fraud or defalcation allegedly committed by the Debtor was, primarily, using Simple Beaute's funds as the Debtor's own personal piggy bank—charging as "business expenses" his and his domestic partner's lavish treatments at spas, vacations, expensive jewelry, clothing, home renovations, a Land Rover and various other items that were largely undocumented and wholly personal in nature. The debt that the Ex-Mrs. Mullen asserts is owed to her by the Debtor is actual damages in the form of one or more of the following: (a) loss of funds to Simple Beaute from the Debtor's inappropriate spending of its funds (presumably her proportionate partnership share thereof); (b) her share of lost profits that would have otherwise been distributed, if not for the inappropriate spending; and/or (c) diminishment in the value of her partnership interest by the inappropriate spending.

As explained further herein, the court has ultimately concluded that the Ex-Mrs. Mullen is, indeed, a creditor of the Debtor with a nondischargeable claim pursuant to Section 523(a)(4) of the Bankruptcy Code—*i.e.,* the Debtor ultimately owes a debt to her as a result of his defalcation while acting in a fiduciary

-4-

capacity. As will be further explained herein, the Debtor was—according to controlling Fifth Circuit case law—acting in a "fiduciary capacity," as contemplated by Section 523(a)(4) of the Bankruptcy Code, in his role as the person in control (*i.e.,* President, Director, and majority shareholder) of the sole managing general partner of Simple Beaute (as later explained, the two-tiered entity structure that was in place did ***not*** insulate the Debtor from owing fiduciary duties directly to the Ex-Mrs. Mullen; the court has further determined that recent changes in Texas statutory partnership law also do not preclude the Debtor from being a fiduciary). Moreover, the Debtor willfully neglected his fiduciary duties with his misuse (*i.e.,* inappropriate spending) of Simple Beaute's money in a rather outrageous and flagrant manner—and a willful neglect of fiduciary duties is a "defalcation," as contemplated by Section 523(a)(4) of the Bankruptcy Code, even when not accompanied by fraud or embezzlement.

Additionally, Texas law recognizes that damages awards are permissible for breaches of fiduciary duties owed to limited partners. The applicable case law holds that damages can be calculated in many different ways (*e.g.,* in the form of restitution equivalent to the loss of partnership investment; lost profits; damages for funds misdirected from the partnership; exemplary damages; *etc.*). Here, the court has determined that the

compensatory damages that should be awarded to the Ex-Mrs. Mullen should equal: (a) the sums that the evidence conclusively showed were misappropriated (or allowed to be misappropriated) by the Debtor from Simple Beaute, (b) multiplied by the Ex-Mrs. Mullen's partnership interest of 38.61%. The evidence from a very credible expert witness, Ken Sibley (through Trial testimony and a voluminous expert report—Plaintiffs' Exhibits 171 & 172) demonstrated to the court's satisfaction that **at least** $1,713,320.67 of funds were improperly spent by the Debtor, or by his domestic partner and booking agents (a Ms. Smyth and a Ms. Moock), with the Debtor's permission ($1,570,551.27 in improper, personal expenses, plus another $142,769.40 booked as an account receivable owed by the Debtor that has never been repaid). Thus, the debt to the Ex-Mrs. Mullen owed by the Debtor that should be excepted from discharge, pursuant to Section 523(a)(4) of the Bankruptcy Code, equals **$661,513.11 ($1,713,320.67 multiplied by 38.61%), less a $26,566.45 credit,**[5] **plus $100,000 of exemplary damages,**[6] **for a total of $734,946.66, plus reasonable attorney's fees, costs and expenses.** Attorney's fees, costs, and expenses are reimbursable to the Ex-Mrs. Mullen, pursuant to at least paragraph 12.8 of the Partnership Agreement between her and the Debtor (and others), and pursuant to Chapter 38 of the Tex. Civ.

---

[5] Such credit will be explained later herein.

[6] The $100,000 of exemplary damages will be explained later herein.

Prac. & Rem. Code. The Ex-Mrs. Mullen is directed to request a separate evidentiary hearing to prove up reasonable attorney's fees, costs and expenses.[7]

Mr. Mullen has not pleaded that his individual claim against the Debtor should be excepted from discharge but has, along with the Ex-Mrs. Mullen, urged that the Debtor should be denied a general discharge, pursuant to Sections 727(a)(2), (4), and (5) of the Bankruptcy Code. With respect to the Section 727(a)(2) count, the allegation is that the Debtor transferred, removed or concealed property of the Debtor (or permitted to be transferred, removed, or concealed property of the Debtor) within one year before the date of filing bankruptcy with the intent to hinder, delay or defraud Mr. Mullen, the Ex-Mrs. Mullen, and other creditors. The Debtor is alleged to have also continued this transferring, removing, and concealing of property after the bankruptcy petition date. The property alleged to have been transferred (all to HCM Holdings, LLC ("HCM"), a business owned by the Debtor's domestic partner, which appears to be nearly identical to the business of Simple Beaute) is as follows: (a) the name "Robert Jones" and goodwill associated therewith; (b) rights/royalties to certain books the Debtor wrote; and (c) uncompensated services (*i.e.,* the Debtor now performs beauty workshops where he promotes the products of HCM for free).

---

[7] The parties to the Adversary Proceeding stipulated at the Trial that, if the court ruled that attorney's fees should be awarded, the amount would be determined in a subsequent hearing.

With respect to the Section 727(a)(4) count, the Debtor is alleged to have knowingly and fraudulently, in or in connection with his case, made a false oath, by omitting material information from his Schedules and Statement of Financial Affairs, including: (a) the Debtor's alleged interest in HCM; (b) the Debtor's alleged guaranty to a book publisher; (c) certain copyrights; (d) certain royalty rights; and (e) certain trademark rights. With respect to Section 727(a)(5) of the Bankruptcy Code, the Debtor allegedly has failed, during the case, to satisfactorily explain a loss or deficiency in assets to meet his liabilities.

The court has concluded that the Plaintiffs have met their burden of proof on the Section 727(a)(2) and (4) counts. The evidence seemed clear that certain rights and opportunities of the Debtor were transferred into HCM after things became contentious with the Mullens and they sued the Debtor in state court. Moreover, the court finds, by a preponderance of the evidence, that the Debtor knowingly and fraudulently made a false oath in his case, by virtue of certain initial omissions from his Bankruptcy Schedules. Specifically, the Debtor failed to schedule certain property, including intellectual property, and the Debtor's beneficial interest in HCM—which, as earlier mentioned, is technically owned by the Debtor's domestic partner (although the Debtor clearly has rights in its assets, value and operations).

For all of the above reasons (and as set forth in more detail

-8-

below) a nondischargeable judgment will be granted in favor of the Ex-Mrs. Mullen in the amount of **$634,946.66, plus $100,000 of exemplary damages, plus reasonable attorney's fees, costs and expenses** (the latter being subject to a future evidentiary prove up). Moreover, the Debtor's global discharge will be denied. All other relief is denied.[8]

## II.  FINDINGS OF FACT

1.  This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I), (J), and (O).

2.  The Debtor filed a chapter 7 case on November 20, 2008 (the "Bankruptcy Case").

3.  This Adversary Proceeding was timely commenced on

---

[8] The court notes that the Plaintiffs' controlling complaint in this Adversary Proceeding, entitled "First Amended Complaint to Determine Dischargeability of Debt Under 11 U.S.C. § 523 and Objecting to Discharge Under 11 U.S.C. § 727 and Request for Declaratory Judgment Regarding Alter Ego" (the "First Amended Complaint") is quite broad. It not only still nominally lists two defendants that were dismissed by this court from the Adversary Proceeding before the filing of the First Amended Complaint (the Debtor's domestic partner and HCM), but it also still requests a declaratory judgment that the domestic partner and HCM are each the alter egos of the Debtor (which request the court earlier dismissed, due to lack of standing on the part of the Plaintiffs). The First Amended Complaint also seems to read largely like a state court petition, in that it alleges such claims as civil conspiracy (among the Debtor, his domestic partner, and others who are not parties in the Adversary Proceeding), and in one place (Count Two), seeks equitable relief in the form of a constructive trust on the Debtor's assets, forfeiture of benefits received by the Debtor, and an accounting from the Debtor. Despite the broad wording of the First Amended Complaint, the issues that the court tried in this Adversary Proceeding were:  (a) whether the Ex-Mrs. Mullen was owed a debt by the Debtor that was nondischargeable under Section 523 of the Bankruptcy Code; and (b) whether the Debtor should be denied a general discharge under Section 727 of the Bankruptcy Code. Alter ego claims were not tried and belong to the Trustee, at this juncture of the Debtor's Chapter 7 case. Any and all other relief is denied.

February 17, 2009. The controlling pleadings are the First Amended Complaint, filed August 17, 2009, and the Defendant Robert Jones' Original Answer to Complaint to Determine Dischargeability of Debt Under 11 U.S.C. § 523 and Objecting to Discharge Under 11 U.S.C. § 727 (the "Answer"), filed March 26, 2009 by the Debtor.[9]

A.   *The Formation of Simple Beaute and the Partnership Agreement*

4.   As mentioned in the Introduction, the Debtor is a professional makeup artist and hair stylist, of some notoriety, who has lived in Dallas since 1997. The Debtor has no college degree or formal business training.[10] Prior to his business venture with the Ex-Mrs. Mullen, the Debtor's career consisted of doing hair styling and makeup, often for commercials, catalogs, magazines, special events, and sometimes for celebrities. He enjoyed some developing reputation in his field, but his reputation was not yet to the point that it has now evolved.

5.   The Ex-Mrs. Mullen was born in Alaska and moved to Texas, as a young teenager, and soon thereafter began a professional modeling career. She met the Debtor sometime in the middle 1990's, on a modeling shoot, in which the Debtor styled her hair and makeup. The Ex-Mrs. Mullen also became acquainted with the Debtor

---

[9] At a hearing held on August 10, 2009, the court granted Plaintiffs' Motion for Leave to File First Amended Complaint [DE # 42], and the court accepted the stipulation of the parties that the Debtor denied the new allegations of the First Amended Complaint and would not be filing an amended answer.

[10] The Debtor testified that he has completed course work at junior colleges and vocational training in the beauty and photography field.

when he worked in beauty pageants in which she participated. The Ex-Mrs. Mullen has no college degree and her only career has been in modeling. She married Mr. Mullen, a chief executive officer of an energy company based in Texas, in 2000 (and they were divorced in 2007).

6. In 2001, the Debtor and the Ex-Mrs. Mullen decided to embark upon a new endeavor in the beauty industry. Specifically, the Debtor wanted to write a book or books, and they decided that they would form a business that would create, market and produce for sale to the public a book and video disk to guide women in choosing the right products (makeup brushes, *etc.*), and using the right techniques, to enhance a woman's individual beauty through the use of cosmetics. The Debtor, with his experience as a makeup artist and connections within the cosmetics industry, and the Ex-Mrs. Mullen, with her experience in the modeling industry and her ability to provide the funding (with, hopefully, the help of Mr. Mullen), decided to form a limited partnership called Simple Beaute. The Ex-Mrs. Mullen consequently approached her then-husband, Mr. Mullen, requesting that he make an investment in Simple Beaute.

7. In evaluating whether or not to loan money for the start-up of Simple Beaute, Mr. Mullen reviewed a business plan (the "Business Plan") that was prepared by the Debtor (with the aid of

an advisor, James L. Piot).[11]   The Business Plan provided that Simple Beaute would act as a publisher and distributor of books, videos and eventually a line of cosmetic products created by the Debtor and the Ex-Mrs. Mullen.   Moreover, the success of Simple Beaute would be due to the "high profit and high margin business" of publishing ("[m]argins are in excess of 40% after tax")[12] as well as the introduction of the Simple Beaute books and videos into the Mary Kay Cosmetics network of sales associates (through personal appearances and demonstrations by the Debtor at Mary Kay workshops or seminars).   The Business Plan also stated that the Debtor would not be taking a salary from Simple Beaute until Simple Beaute had attained profitability and repayment of its development debt.[13] And, in a section 1.3 of the Business Plan entitled "Keys to Success," second on a bullet-point list was "Controlling costs while developing the most professional book and video."[14]   The Business Plan further provided that Simple Beaute would "have exclusive rights to all print media, electronic media, catalogue

_____

[11] *See* Plaintiffs' Exhibit 127.

[12] *Id.* at p.1 (¶¶ 4 & 5).

[13] *Id.* at p.4 (§ 2.0; ¶ 3) ("[o]ther than development times requiring Mr. Jones professional fee charges he will not be taking a salary from the company, until the company has attained profitability and repayment of development debt").   This reference to "development times" professional fee charges meant that the Debtor would be entitled to charge to Simple Beaute (as a contractor) his professional stylist fee normally charged for any hair styling and makeup services he performed in connection with photo shoots for Simple Beaute's books.   *See also* Testimony of the Debtor at Trial on October 20, 2009.

[14] *Id.* at p.3 (§ 1.3).

business, seminars and workshops devoted to Simple Beaute product lines, and the promotion therefor."[15]  Mr. Mullen ultimately agreed to loan $750,000 to Simple Beaute.

8.    On or about May 22, 2001, Mr. Mullen and Simple Beaute executed a promissory note for the principal sum of $750,000, plus accrued interest at 10% (the "Note").[16]  The Note was set to mature on June 1, 2004.  As part of the same transaction, on or about May 22, 2001, the Debtor executed and delivered to Mr. Mullen a written personal guaranty agreement (the "Guarantee") for the Note.[17]

9.    Immediately prior to obtaining the loan from Mr. Mullen, on May 18, 2001, Simple Beaute was organized as a Texas limited partnership under the laws of the State of Texas,[18] and an Agreement of Limited Partnership (the "Partnership Agreement")[19] was executed by its newly-created 1% general partner, Beaute Management, Inc. (the "Corporate GP") and each of its limited partners: the Debtor (50.49%); the Ex-Mrs. Mullen (38.61%); and Seaminx Artist Management, Inc. ("Seaminx") (9.9%), which was a company owned by a Ms. Elaine Moock ("Ms. Moock") and a Ms. Sunni Smyth ("Ms. Smyth"), two women who were friends of the Debtor and would help

---

[15] *Id.* at p.4 (§ 2.0; ¶ 3).

[16] *See* Plaintiffs' Exhibit 19.

[17] *See* Plaintiffs' Exhibit 20.

[18] *See* Plaintiffs' Exhibit 2.

[19] *See* Plaintiffs' Exhibit 1.

out with various tasks associated with the new enterprise, especially booking talent. The Corporate GP was organized as a corporation under the laws of the State of Texas on May 18, 2001,[20] and was owned as follows: (1) the Debtor owned 51%; (2) the Ex-Mrs. Mullen owned 39%; (3) Ms. Moock owned 5%; and (4) Ms. Smyth owned 5%.[21] Until May 25, 2007, the Debtor and the Ex-Mrs. Mullen were the two directors of the Corporate GP (the "Board").[22] The initial officers of the Corporate GP were the Debtor as president, Steve Davidson as vice president, the Ex-Mrs. Mullen as vice president, Ms. Moock as secretary, and Ms. Smyth as treasurer.[23] Pursuant to the bylaws of the Corporate GP, the president was the chief executive officer of the corporation and had, subject only to the Board, general and active management and supervision of the business of the corporation and was to see that all orders and resolutions of the Board were carried into effect.[24] The organizational documents, as well as the Partnership Agreement, were both drafted by Steve Davidson, who was an attorney that provided legal services to Mr. Mullen.

---

[20] *See* Plaintiffs' Exhibits 4 & 5.

[21] *See* Plaintiffs' Exhibit 7 (p. 3) & Plaintiffs' Exhibit 8.

[22] *See* Plaintiffs' Exhibit 6 (p.3, art. 10). There was credible evidence that, on May 25, 2007, the Debtor, Ms. Moock, and Ms. Smyth purported to remove the Ex-Mrs. Mullen as a director and appointed Ms. Moock and Ms. Smyth to the board to serve as directors with the Debtor. *See, e.g.,* Plaintiffs' Exhibit 152.

[23] *See* Plaintiffs' Exhibit 7 (p. 1).

[24] *See* Plaintiffs' Exhibit 6 (art. 4.2).

10. The Partnership Agreement contained several key provisions regarding the operation of Simple Beaute. First, article 3.1 of the Partnership Agreement provided that the Corporate GP was the "sole manager" of Simple Beaute and had "exclusive power, authority and discretion in the conduct of the business and affairs" of Simple Beaute.[25] Second, article 4.1 of the Partnership Agreement provided that the Corporate GP was to have "complete and exclusive discretion in the management and control of the business" of Simple Beaute."[26] Third, article 4.3 of the Partnership Agreement stated that the Corporate GP was required to manage Simple Beaute's affairs in a "prudent and businesslike manner" and was required to act at all times in the best interests of Simple Beaute.[27] Fourth, article 4.8 of the Partnership Agreement provided that the Corporate GP may charge to Simple Beaute and/or be reimbursed out of Simple Beaute's funds, all **"reasonable** expenses" incurred by the Corporate GP in the operation of Simple Beaute, except for corporate overhead or salaries of the Corporate GP's employees.[28] Finally, article 8.1 of the Partnership Agreement provided that all revenues from operations of Simple Beaute, after deducting funds used to pay or

---

[25] *See* Plaintiffs' Exhibit 1 (art. 3.1).

[26] *Id.* (art. 4.1).

[27] *Id.* (art. 4.3).

[28] *Id.* (art. 4.8) (emphasis added).

establish a reserve for debt service and all other expenses related to the operation and administration of the Partnership (defined as "Net Cash Flow" in the Partnership Agreement), were to be distributed to the partners (based on their applicable ownership percentage of the Partnership) on a quarterly basis.[29]  The Partnership Agreement did not contain any additional provisions which permitted either the Corporate GP or any of the limited partners of Simple Beaute to receive a salary.

11.  In general, the Ex-Mrs. Mullen's role with Simple Beaute was to assist in providing and/or obtaining funding for it and to assist in the development and marketing of the books and videos (such as through personally modeling for the pictures in the books,[30] obtaining other models for use in the books, and perhaps making personal appearances with the Debtor and providing some consultation).[31]  The Debtor's role would be to author the "how to" portion of the books and videos[32] (and do some of the hair and makeup for the photo shoots for the books).  The Debtor's role further was to market the books through personal appearances and,

---

[29] *Id.* (art. 8.1).

[30] The unrefuted evidence was that the Ex-Mrs. Mullen did not get paid for her modeling for Simple Beaute books and did receive any sort of commissions or other payments for the models that she arranged to pose for the books.

[31] The credible testimony indicated that it was not the intention—or ultimate reality—that the Ex-Mrs. Mullen would be involved in the day-to-day business of Simple Beaute.

[32] The Debtor testified that he had the help of a "ghost writer," which was paid by Simple Beaute.

in particular, through his network/connections in the beauty industry, including sales consultants for Mary Kay Cosmetics Company (*i.e.,* offering, essentially, "how-to" workshops to Mary Kay consultants and their sales representatives and hopefully selling books and other Simple Beaute products in the process). The Debtor's friends, Ms. Moock and Ms. Smyth, would serve in the roles of providing talent-and-booking-agent services to Simple Beaute (*i.e.,* they would, through their talent agency, Seaminx, book hair and makeup stylists for the photo shoots on the Simple Beaute books, including booking the Debtor himself as makeup artist and stylist, and their agency Seaminx would receive a 20% commission on whatever the artist was paid for his/her services; they also arranged Mary Kay workshops and travel details associated therewith). Ms. Smyth was also asked by the Debtor to perform bookkeeping services for Simple Beaute.[33]

B. *Simple Beaute's Business from 2001-2007*

12. Simple Beaute's first book was called "Beaute Made Simple" and was published in 2002, and the VHS and DVD versions of "Beaute Made Simple" became available for purchase in 2002.[34] The Debtor wrote the book and the DVD. The book was self-published by

---

[33] The Ex-Mrs. Mullen credibly testified at Trial that Simple Beaute was originally going to be owned 50%-50% by the Debtor and the Ex-Mrs. Mullen, but the Ex-Mrs. Mullen agreed that Ms. Moock and Ms. Smyth could each receive 5% interests in the partnership, in lieu of compensation, and the Ex-Mrs. Mullen would agree to take a 39% ownership interest in order to allow this to happen.

[34] *See* Plaintiffs' Exhibit 198.

Simple Beaute. In addition to launching the first book, Simple Beaute also registered the word mark, "Beaute Made Simple" with the United States Patent and Trademark Office ("USPTO").[35]

13. Following the success of Simple Beaute's initial book and DVD product, Simple Beaute expanded its business model to include the development of certain products (*e.g.*, makeup brushes) under the name "Simple Beaute." In addition, Simple Beaute also expanded its business to include the sale of beauty-related products other than those it actually produced.

14. In 2004, the Debtor wrote, and Simple Beaute self-published, two more books called "Robert Jones Simple Beaute" and "Robert Jones Beaute Occasions: Bridal Beaute and Beyond ."[36] There was credible testimony that these publications were made possible, in large part, due to an additional loan to Simple Beaute arranged by Mr. Mullen. In or about August of 2003, Mr. Mullen coordinated and guaranteed a loan from a bank to Simple Beaute in the amount of $300,000 (the "$300,000 Loan").[37]

15. After self-publishing three books, Simple Beaute contracted with a publisher, Fair Winds Press, to publish additional books. These additional books and DVDs included "Makeup Makeovers: Expert Secrets for Stunning Transformations," which was

---

[35] *See* Plaintiffs' Exhibits 33-35.

[36] *See* Plaintiffs' Exhibit 270 & Plaintiffs' Exhibit 201.

[37] See Testimony of the Debtor at Trial on October 20, 2009.

published in September of 2005, and "Makeup Makeovers: Weddings-Stunning Looks for the Entire Bridal Party," which was published in November of 2006.[38]  Simple Beaute sold its books, DVDs, and other products in a variety of fora, including sales through Simple Beaute's own internet website (www.simplebeaute.com), Amazon.com, retail bookstores, seminars, and workshops.

16.  According to Simple Beaute's QuickBooks accounting records, from May 18, 2001 to July 22, 2007, Simple Beaute received gross income of $6,150,989.02, and after deducting cost of goods sold, had a gross profit of $4,798,605.80.[39]  After deducting alleged expenses, however, Simple Beaute had a net profit of only $428,558.46 during this roughly six-year period.[40]  Moreover, the federal income tax returns for Simple Beaute reported the following income and profits from 2001 to 2005: (1) for 2001, a loss of $1,517.00; (2) for 2002, a profit of $120,497.00; (3) for 2003, a loss of $51,014.00; (4) for 2004, a profit of $34,672.00; and (5) for 2005, a profit of $194,708.00.[41]  The Corporate GP also filed federal income tax returns during the same period reflecting as its only income and expense its 1% share of profits and losses from Simple Beaute and no assets other than a $1,000 loan to its

---

[38] *See* Plaintiffs' Exhibits 203-A, 203-B & 202.

[39] *See* Plaintiffs' Exhibit 22.

[40] *Id.*

[41] *See* Plaintiffs' Exhibits 9-13.

shareholders and intangible assets.[42]

17. Consistent with the management structure provided in the Partnership Agreement, which required the Corporate GP (of which the Debtor was President, a Director, and 51% owner) to exclusively manage Simple Beaute, the Debtor did, in fact, essentially, act as the sole manager of Simple Beaute. The Debtor credibly testified that he was in control of Simple Beaute and was ultimately responsible for managing Simple Beaute.

C. *The Alleged Expenses of Simple Beaute*

### i. Alleged Expenses Related to the Promotion of Simple Beaute Products

18. Consistent with its initial strategy, in order to promote the sale of its books and other products, Simple Beaute made the Debtor available for seminars and workshops nationwide. The Debtor frequently conducted workshops for sales representatives for Mary Kay Cosmetics. The Debtor credibly testified that he conducted, on average, 55 workshops per year and attended the annual Mary Kay Cosmetics seminar in Dallas. The Debtor further credibly testified that, during his time with Simple Beaute, he was personally paid between $1,500 and $2,500 per workshop as his own fee, by the Mary Kay representatives, and that his personal travel expenses were to also be paid by the Mary Kay representative who arranged the workshop. However, the Debtor also testified that some of the

---

[42] *See* Plaintiffs' Exhibits 14-18.

expenses relating to these workshops were, in fact, paid by Simple Beaute, including airfare for the Debtor's assistant, lodging for his assistant, and meals.

19. The court's simple math efforts show that 55 workshops per year at $1,500-$2,500 per workshop would have yielded between $82,500-$137,500 of personal fee income for the Debtor (not Simple Beaute) as a result of these efforts to promote Simple Beaute books/products on the road. Moreover, while the Debtor credibly testified that he spent a lot of time on Simple Beaute's books over the years (without compensation, *per se*, from Simple Beaute), to be clear, the Debtor had a whole other business (besides Simple Beaute), on his own, of being a makeup artist (which work was done in his home, at special events, photography shoots for commercials, catalogs, and magazines, *etc*.) and now—for the first time—at these Mark Kay workshops, the Debtor was earning a new source of income of $1,500-$2,500 per appearance. Plus, the Debtor charged a regular fee (to be paid to himself personally from Simple Beaute) whenever he worked as an artist on the photo shoots for the Simple Beaute books. While an argument could, perhaps, have been made that the Debtor's times at Mary Kay workshops and while otherwise engaged promoting and working on Simple Beaute's books and other products distracted him from his other career as a stylist/makeup artist-for-fee, and cost him income in that regard, such argument was not credibly made by the Debtor. In fact, the totality of

-21-

credible evidence suggested that Simple Beaute's books (and the appearances and notoriety that came therewith) catapulted the Debtor's career to a level that he had never reached before Simple Beaute.

### ii. Expenses Charged to Simple Beaute that Were Undoubtedly Personal in Nature

20. There was overwhelming evidence at Trial that, early on in Simple Beaute's existence, the Debtor began using Simple Beaute's funds for his own personal benefit, as did other limited partners with the Debtor's knowledge or consent (i.e., Ms. Moock and Ms. Smyth), and as did the Debtor's domestic partner, Harold Charles "Chip" McFadin ("Mr. McFadin")[43] with the Debtor's participation and consent. The Debtor testified that he kept a Simple Beaute check book at his home and that he used it to pay expenses. Ms. Moock and Ms. Smyth also testified that they kept a Simple Beaute check book in their office at Seaminx. There was also testimony that the Debtor, Ms. Moock, Ms. Smyth, Mr. McFadin, and the Ex-Mrs. Mullen each had their own credit cards that they used to charge expenses to Simple Beaute (and all credit card statements went to the Debtor's home).

---

[43] The court uses the term "domestic partner" to refer to Mr. McFadin because the Debtor and Mr. McFadin reside together in the State of Texas and consider themselves joined in a civil union. The evidence was that the Debtor and Mr. McFadin were actually married in a wedding ceremony that took place in Boston, Massachusetts (where same-gender marriages are authorized by state law) approximately three years before the Trial. The Debtor and Mr. McFadin have been involved in a significant relationship for more than 13 years.

### a.) Examples of Personal Expenses Charged by the Debtor and Mr. McFadin to Simple Beaute

21. As just mentioned, there was overwhelming testimony that, throughout the life of Simple Beaute, the Debtor used Simple Beaute funds to pay certain personal expenses. First, the accounting books of Simple Beaute show that the Debtor has accounts receivable owed to Simple Beaute of $142,769.40 (the "AR").[44] This AR amount includes $49,464.89 in expenditures that were originally classified as "office expenses," but were reclassified in 2003 as an account receivable owed by the Debtor to Simple Beaute.[45] Most of the reclassified expenditures appear to be for work on the Debtor's and Mr. McFadin's personal residence. Specifically, the Debtor used Simple Beaute funds, including almost $24,000, for payments to "Archetype Design," to construct a studio/office at the home owned by him and Mr. McFadin.[46] The AR also includes $19,000.00 spent on a down payment for a new Range Rover that the Debtor purchased in his name, but was used primarily by Mr. McFadin, as well as continuing monthly payments of $1,335.00 on the loan taken out from Sterling Bank to finance the Debtor's purchase of the Range Rover.[47]

---

[44] *See* Plaintiffs' Exhibit 171, schedule G.

[45] *Id.*

[46] *See* Plaintiffs' Exhibit 68.

[47] *See* Plaintiffs' Exhibit 171, schedule G & Plaintiffs' Exhibits 83-86. The Debtor testified that he ended up selling the Range Rover to Mr. McFadin in 2006 for no consideration. *See* Testimony of the Debtor at Trial on October 20, 2009.

The AR also includes additional monthly payments of $4,522.70 and other amounts paid to Sterling Bank for a personal loan taken out by the Debtor.[48]

22. Simple Beaute funds were also spent on leasing, furnishing and maintaining an apartment in New York City that was leased in the Debtor's name.[49]  The Debtor testified that the apartment was actually shared with his friend, Ms. Tracy Allred, and the costs on the apartment were split between Ms. Allred and Simple Beaute.  Among other things, Simple Beaute paid for furniture, including bedroom furniture, a TV and cable.  There was testimony from the Debtor that he used Simple Beaute's money to pay for this apartment and its furnishings because he used the apartment when he was staying in New York to conduct business for Simple Beaute (art directors were in New York and he did TV shows there).  The Debtor testified that it was cheaper than a hotel.  But, it is unclear from any evidence exactly how much time the Debtor spent in New York, and how much of the time was truly for Simple Beaute's benefit.  While the Debtor testified that he did some TV appearances, the Debtor also testified that he only did one Mary Kay workshop in New York and three in Newark, New Jersey in

---

[48] *See* Plaintiffs' Exhibit 171, schedule G, Plaintiffs' Exhibits 75-76 & Plaintiffs' Exhibit 78.

[49] *See eg.,* Plaintiffs' Exhibit 160(47), Plaintiffs' Exhibit 160(57) & Plaintiffs' Exhibit 160(34).

Simple Beaute's roughly six-year existence.[50]

23.   During the time period starting in mid-2005 through March of 2007, the Debtor and Mr. McFadin also spent Simple Beaute funds for their personal use and enjoyment at spas and resorts. Approximately $7,000 was spent at the Crescent Spa in Dallas, Texas, for personal treatments for the Debtor and Mr. McFadin.[51] The Debtor confirmed in Trial testimony that he and Mr. McFadin received massages, facials (*e.g.,* exfoliation, gommage,[52] "Z" peels), manicures, pedicures, eyelash tinting, back and shoulder waxes, and seaweed wraps.   The Debtor also testified that he believed these expenses were business in nature, since his job required him to keep a presentable appearance in order to better market Simple Beaute's products.

24.   In addition, approximately $18,000.00 of Simple Beaute's funds were spent on vacations that the Debtor and Mr. McFadin took to exclusive resorts, including the Little Palm Island Resort and Spa in Florida and the Maroma Resort and Spa in Riviera Maya,

---

[50] The Debtor testified that the lease on the New York apartment was obtained in 2003 and was terminated in 2006; it then went on a month-to-month arrangement, and then the Debtor vacated it in March 2009—which was four months after the bankruptcy filing.   Ms. Allred took the furniture therein, although some was donated to the Salvation Army.

[51] *See* Plaintiffs' Exhibits 91-109.

[52] As the fictional Elle Woods (*Legally Blond*, 2001) or any Cosmo-reader would know, "gommage" comes from the French word that means to "erase."   It is a cream or paste that is thinly applied to the skin to exfoliate it.   It is typically a part of a facial, although it can be used in body treatments. Notably, a gommage is more labor-intensive than a salt glow or body scrub.

-25-

Mexico.[53] As to these vacations, the Debtor testified that he believed these trips to be "working vacations" and, as such, were legitimate business expenses.

25. Simple Beaute funds were also spent on lavish personal jewelry including: (a) $36,690 on November 30, 2005, for wedding bands from Fragments in New York City, for the Debtor and Mr. McFadin;[54] (b) $8,135 on December 23, 2005, for a ring (also from Fragments) for the Debtor's mother;[55] (c) $2,137 on December 20, 2005, for a necklace (from Tiffany's) for a gift for a friend;[56] (d) $19,890 on December 24, 2005 for a watch (from Richard Eiseman's Jewelry Stores) for the Debtor's mother;[57] (e) $9,661 on July 29, 2006, for another watch (from Cartier) for the Debtor's best friend;[58] and (f) approximately $6,000 for a Ylang Ylang bracelet that the Debtor bought for himself to celebrate his first book publishing deal.[59]

---

[53] *See* Plaintiffs' Exhibit 110.

[54] *See* Plaintiffs' Exhibits 197, p.532.

[55] *See* Plaintiffs' Exhibits 197, p.540.

[56] *Id.*

[57] *Id.*

[58] *Id.* at p.607.

[59] *See* Testimony of the Debtor at Trial on October 19, 2009.

-26-

b.)  Personal Expenses Charged by Ms. Moock[60]

26.  There was credible testimony from Ms. Moock that, with the Debtor's consent, she also used Simple Beaute funds in June 2006 to pay for a personal vacation for herself and her family to Florida and Louisiana.[61]  Also with the Debtor's consent, Ms. Moock testified that she used Simple Beaute funds to pay for personal lunches, dinners,[62] clothes, furniture, furnishings, groceries, gas, wine, movies, shows, music, books, auto repairs, yoga, Pilates, face creams, shoes, Sirius Radio for the Seaminx office (which was actually an apartment), jewelry, lingerie, tickets to the LSU Final Four games, and spa treatments.[63]

27.  The Debtor and Ms. Moock also both credibly testified that the Debtor was aware of Ms. Moock's personal expenditures, but they both stated that, at the time, they thought the expenditures were legitimate business expenses because Ms. Moock was not being

---

[60] Ms. Moock testified that she worked as a producer and participated in the day-to-day management of Simple Beaute.  As earlier mentioned, she also co-owned a separate business, Seaminx, that booked the talent for photo shoots and arranged workshops.  Ms. Moock is a high school graduate with no education beyond that.

[61] Simple Beaute also paid for Ms. Moock's trip to Boston to attend the Debtor and Mr. McFadin's Massachusetts wedding ceremony, including lodging at the Elliot Hotel.

[62] The highly credible Trial testimony of Ken Sibley (October 22, 2009), expert witness (Certified Public Accountant and forensic accountant) for the Plaintiffs, was that it was "almost a daily occurrence" for Ms. Moock, Ms. Smyth, and the Debtor to buy three meals a day at Simple Beaute's expense.

[63] The Debtor actually testified on October 20, 2009, that he did not know that Ms. Moock and Ms. Smyth were getting spa treatments with Simple Beaute's money, nor perhaps about their regular use of Simple Beaute credit cards for meals, but the Debtor would not have had a problem with it if he had known.

paid a salary by Simple Beaute and deserved to be compensated. However, there was testimony from the Debtor and Ms. Moock that Ms. Moock was paid a $10,000 bonus by Simple Beaute for her services and was earning (through her co-ownership of Seaminx) 20% commissions whenever Seaminx booked artists/stylists (including the Debtor) for photo shoots on Simple Beaute's books and when booking the Debtor's services provided at the Mary Kay workshops.

c.)  Personal Expenses Charged by Ms. Smyth

28.  As mentioned above, Ms. Smyth was a co-owner with Ms. Moock of Seaminx, the talent/booking agency that was paid commissions for providing makeup artists and stylists for Simple Beaute and for booking the Debtor's workshops.  She had been with Seaminx since January 2000 and, before that, worked in the long term  health care industry (she has a degree in clinical nutrition and no business training).  As also mentioned earlier, Ms. Smyth and Ms. Moock had small equity interests in Simple Beaute.  Ms. Smyth, besides the booking services performed through Seaminx, did bookkeeping or "data entry" for Seaminx and evolved into doing the same for Simple Beaute.  She did not do any tax work for Simple Beaute—another individual named Betty Rogers did.  Ms. Smyth confirmed that she, Ms. Moock, and the Debtor were the ones with check-writing authority for Simple Beaute and checks were kept at both the Debtor's home and the Seaminx office.  As for the Debtor's use of Simple Beaute's funds to pay for expenses in the Debtor's

life, Ms. Smyth credibly testified at the Trial that she "took his word for it" whether it was a business expense or personal, and she did not "feel it was her place to question the Debtor."

29. Since at least August of 2003, with the Debtor's consent, Ms. Smyth testified that she used Simple Beaute's funds to pay for airfare, rental cars, and lodging for her and her family while on personal vacation trips. Ms. Smyth also testified that she used Simple Beaute's funds to pay for other personal expenses that were unrelated to Simple Beaute business including, but not limited to: clothes and personal cosmetics from Neiman Marcus; meals (including a $400 meal that just she and Ms. Moock enjoyed at Tei Tei Robata and a $671.30 dinner that just she and her husband enjoyed at the former Aurora Restaurant), and wine (for consumption at the office—apparently, in her and Ms. Moock's view, that made it a legitimate business expense). Other specific examples of Ms. Smyth's personal expenditures made with Simple Beaute's funds were: payment for airfare for Ms. Smyth and her children to visit family in Little Rock, Arkansas on multiple occasions; family vacations to Gulf Shores, Alabama, including one in 2004 and another in 2005[64] (in 2004, Ms. Smyth used Simple Beaute funds to pay for the condominium where her family stayed, for meals, and for approximately $430.00 of beachwear purchased at Ocean Eddie's;[65]

---

[64] *See, e.g.*, Plaintiffs' Exhibit 171, 2004 Tab, p.65.

[65] *See* Plaintiffs' Exhibit 171, 2004 Tab, p.88.

in 2005, she again spent Simple Beaute's funds of approximately $1,200.00 for the condominium where she and her family stayed[66] and also used approximately $360.00 of Simple Beaute funds to pay for the rental car her family used while in Alabama[67]).

30. In December 2006, Ms. Smyth, yet again, used Simple Beaute funds to pay for airfare, meals, a rental car (approximately $715.00) and tickets to the Magic Kingdom at Walt Disney World (approximately $1,000.00) related to her family's vacation to Florida.[68] Ms. Smyth also spent approximately $1,000.00 for her and her husband to stay at the Hotel ZaZa on a personal getaway trip.[69]

31. The Debtor and Ms. Smyth both testified that the Debtor was aware of Ms. Smyth's personal expenditures, but they explained that, at the time, they thought the expenditures were legitimate business expenses, because Ms. Smyth was not being paid a salary by Simple Beaute and deserved to be compensated. There was further testimony that Ms. Smyth was paid a $10,000 bonus by Simple Beaute for her services on one or more of the books, and, as earlier mentioned, she was earning (through her co-ownership of Seaminx) 20% commissions whenever Seaminx booked artists/stylists (including the Debtor) for photo shoots on Simple Beaute's books and when

---

[66] *See* Plaintiffs' Exhibit 171, 2005 Tab, p.96.

[67] *See* Plaintiffs' Exhibit 171, 2005 Tab, p.94.

[68] *See* Plaintiffs' Exhibit 171, 2006 Tab, pp.84, 86 & Plaintiffs' Exhibit 133.

[69] *See* Plaintiffs' Exhibit 171, 2005 Tab, pp. 96, 105.

booking the Debtor's services provided at the Mary Kay workshops.

### d.) Personal Expenses Charged by the Ex-Mrs. Mullen

32.   There was also some evidence that the Ex-Mrs. Mullen used Simple Beaute's funds to pay for a few personal expenses.   While this is relevant to the court, notably, the evidence was that these personal expenditures were insignificant in terms of dollar amount and number of times of occurrence—relative to the Debtor's, Mr. McFadin's, Ms. Moock's and Ms. Smyth's daily routine of free-spending of Simple Beaute's money.   Moreover, they were largely booked differently in Simple Beaute's records—many times as draws (diminishing her partner account)—rather than as business expenses.

33.   Specifically, the Ex-Mrs. Mullen credibly admitted that she used Simple Beaute's funds to pay for some purchases in Aspen, Colorado, to pay for a family portrait, to pay for a tiara, and to pay for certain furniture and furnishings for her mother's apartment when her mother moved to Dallas.[70]   These expenditures, according to the credible testimony, apparently amounted to around $32,000.[71]   It appears that most if not all of these charges were made in 2003 on an American Express Business Card for Simple Beaute

---

[70] *See* Plaintiffs' Exhibit 214.

[71] *See* Plaintiffs' Exhibits 213-216.   The monthly credit card statements, which were submitted into evidence, show charges (not including annual credit card fees) of: $81.03, $593.19, $2,016.69, $885.48, $1,694.19, $510.87, $31.74, $1,353.70, $11,610.21, $15,002.51, $1,425.11, $561.19, and $1,000.   There were also credits made to the Ex-Mrs. Mullen's partnership account in the amounts of: $1,780.71, $885.49, and $1,639.99.   These charges and credits add up to $32,459.72.

that the Ex-Mrs. Mullen possessed.[72]  The Ex-Mrs. Mullen credibly

testified that she used this card when her own personal credit card

was declined, when her monthly "allowance" from Mr. Mullen had run

out, and after asking the Debtor for permission.  Moreover, as

mentioned above, many of these charges were booked in the Simple

Beaute accounting records as a ***partnership draw***[73] on the Ex-Mrs.

Mullen's partnership interest and were treated as a profit

distribution (which would diminish the Ex-Mrs. Mullen's partnership

capital account), rather than as a business expense of Simple

Beaute (such as occurred with the personal expenses of the Debtor,

Mr. McFadin, Ms. Moock, and Ms. Smyth).[74]  In reviewing the

QuickBooks records for Simple Beaute, the court also discovered an

additional $5,000 account receivable, which was booked as a "check"

to the Ex-Mrs. Mullen on February 20, 2004.  Accordingly, since

there is approximately $27,000 in charges that were apparently not

---

[72] *See Id.*

[73] The Ex-Mrs. Mullen's partnership account in Simple Beaute's records references: (a) federal income taxes of $9,189.00 paid in 2003 to the United States Treasury; (b) $10,893.27 in American Express charges in 2003 made by the Ex-Mrs. Mullen; and (c) $5,269.10 shown as an unidentified general journal entry at the end of 2003 (the court would note that in looking at Plaintiffs' Exhibit 69, the QuickBooks records of Simple Beaute show **two** account receivables for Tiffany Mullen, one for $5,000 and another for $5,269.10).

[74] The Ex-Mrs. Mullen credibly testified that she never was, and never was contemplated to be, involved in the day-to-day business of Simple Beaute.  She did, however, do the following for Simple Beaute without compensation:  (a) model for various books without charging any fee (a few days for each book); (b) provide six or seven of the models for the books (including Pat Smith, wife of football legend Emmitt Smith) with no compensation to them; (c) loan clothing and jewelry and obtain  borrowed (and returned) clothing for the shoots from Neiman Marcus, Gregory's, Stanley Korshak and other clothing stores; (d) review proofs; and  (e) in the early days, travel and appear on certain TV shows including *Good Morning America*.

booked as a partnership draw in the Ex-Mrs. Mullen's partnership account (roughly $22,000 in American Express card charges, as well as an additional $5,000 account receivable which was never repaid by the Ex-Mrs. Mullen), the court will adjust the Ex-Mrs. Mullen's damages accordingly, as further addressed below.

34. It should be stressed that the court found it significant that, on the few occasions that the Ex-Mrs. Mullen used the company credit card to charge something personal, it was treated by her and the others as an exceptional, atypical event (for which permission was sought and there was a special accounting treatment given in Simple Beaute's records, or expected to be given). With the Debtor, Mr. McFadin, Ms. Moock and Ms. Smyth, using a Simple Beaute credit card for nearly every occasion in life was standard operating procedure—as normal as breathing.

e.) <u>Meals</u>

35. Almost $75,000.00 of Simple Beaute's funds were spent on meals at a multitude of restaurants.[75] The Debtor, Mr. McFadin, Ms. Moock, and Ms. Smyth each used Simple Beaute's funds to pay for these personal meals on multiple occasions. The Debtor was aware of and consented to these charges. The Debtor testified at Trial that he believed it was fine to charge meals to Simple Beaute if one was eating while working (or the meal was otherwise work-

---

[75] *See* Plaintiffs' Exhibit 160(78).

-33-

related, such as involving a client).[76]  It appeared from the credible evidence that meals were charged to Simple Beaute at all times of the day and week.

### f.) Clothes

36.  More than $186,000.00 of Simple Beaute's funds was spent on "wardrobe and props".[77]  The Debtor testified that wardrobe and props were necessary for photo shoots related to Simple Beaute's books, videos and DVDs.[78]  However, there was also testimony from the Ex-Mrs. Mullen and Ms. Moock that the wardrobe and props for the photo shoots were usually procured by calling in special favors to the stores to *borrow* such items, and, thus, the need to buy clothing should have been minimal.[79]  Moreover, the Debtor testified that he purchased suits, shoes, and other clothes that he claimed were used in personal appearances for the benefit of Simple Beaute. Ms. Moock and Ms. Smyth also admitted that they used Simple Beaute's funds to purchase clothes for themselves.

37.  There were several charges to Neiman Marcus classified as "wardrobe and props," many of which individually exceeded

---

[76] *See* the Testimony of the Debtor at Trial on October 20, 2009. The Debtor testified that he considered a "client" to be a Mary Kay sales representative for whom he might conduct a workshop.

[77] *See* Plaintiffs' Exhibit 160(84).

[78] The Debtor also testified that he still has some props and wardrobe belonging to Simple Beaute at his house, such as jewelry and dresses of unknown value. *See* Testimony of the Debtor at Trial on October 20, 2009.

[79] *See* Plaintiffs' Exhibit 171, pgs. 11-12.

$1,500.00.[80] In addition to the expenditures at Neiman Marcus, approximately $53,500.00 of Simple Beaute's funds was spent on "workshop" expenses.[81] However, many of these expenditures appear to be personal expenditures for the Debtor, Mr. McFadin, Ms. Moock, and Ms. Smyth, including $2,787.17 paid to Preston Luggage, which the Debtor admitted was for luggage for him and his assistant to use when they traveled to workshops as well as expenditures at Saks Fifth Avenue, Henri Bendel, John Varvatos-NY, Bloomingdales and many other stores.[82]

> ### q.) Airfare and Hotel Expenses Related to the Debtor's Workshops

38. Almost $95,000 of Simple Beaute's funds was spent on airfare for the Debtor to travel within the United States and abroad.[83] An additional amount of $81,500.00 of Simple Beaute's funds was spent on "hotels."[84] The Debtor, as earlier mentioned, attended, on average, 55 workshops per year where, for a personal fee that he retained, he would teach women techniques for applying makeup (and would hopefully sell them Simple Beaute products in the process). The Debtor represented to the Ex-Mrs. Mullen that the cost of travel would be reimbursed by the women who arranged the

---

[80] *See* Plaintiffs' Exhibit 160(84).

[81] *See* Plaintiffs' Exhibit 160(86).

[82] *Id.*

[83] *See* Plaintiffs' Exhibit 160(74).

[84] *See* Plaintiffs' Exhibit 160(77).

workshops that he attended.  However, there was little evidence that the Debtor billed Mary Kay representatives the airfare and hotel expenses on which he had spent Simple Beaute funds, and the Debtor also admitted that he did little, if anything, to collect the billed expenses, thereby causing Simple Beaute to bear almost all of the expense of the Debtor's travel for these workshops. While it would appear that Simple Beaute did receive some benefit from the travel, since the Debtor promoted and hopefully sold some Simple Beaute products at these workshops,[85] the Debtor used Simple Beaute's funds to front most of the workshop expenses.

### h.) Automobile Expenses

39.  Approximately $5,850 of Simple Beaute's funds was spent on automobile expenses, notwithstanding the fact that Simple Beaute

---

[85] The Debtor credibly testified that between 100 and 1,700 women might attend a Mary Kay workshop (usually in a hotel) and he would teach his techniques all day (again for his $1,500-$2,500 personal fee) and would hopefully sell Simple Beaute products, including his books.  The Debtor estimated that 70-80% of Simple Beaute's revenue was generated from the workshop appearances.  He also estimated that in the beginning, there would be $5,000-$6,000 in sales of Simple Beaute books/product at a workshop; then $10,000-$15,000 on average; then up to $33,000-34,000 at some workshops.  *See* Testimony of the Debtor at Trial on October 20, 2009 & January 14, 2010.

It is likely impossible for this court, as fact finder, to verify this uncorroborated testimony, since the records of Simple Beaute are in poor shape. *See* Plaintiffs' Exhibit 171 (Report of Expert, Ken Sibley), p.2. Moreover, the Expert Report of Ken Sibley (which the court finds highly credible) notes significantly:  (a) the Debtor's original Business Plan advised that the Debtor would be focusing his attention on the Mary Kay National Seminar (in Dallas) where there could be 50,000 Mary Kay representatives in attendance, as potential customers of Simple Beaute products, or on Regional Conferences, that may have 15,000 Mary Kay Representatives in attendance as potential customers; (b) instead, the Debtor regularly traveled to locations/workshops that appeared only to have a possibility of having enough customers and sales to cover the travel expenses; and (c) a large number of Simple Beaute books were ultimately sold on the Simple Beaute website, Amazon.com, and other bookseller websites. *See* Plaintiffs' Exhibit 171, at p.9.

owned no automobile.[86]  Specifically, there was credible testimony that Simple Beaute's funds were used to repair and maintain the Range Rover owned by the Debtor, to pay for the gas for the Range Rover, and to pay for auto repairs for Ms. Moock's personal vehicle.

### i.)  Compensation for Mr. McFadin

40.  Approximately $307,500.00 of Simple Beaute's funds was paid to Mr. McFadin since the formation of Simple Beaute in 2001.[87] This amount includes payment for alleged services and gifts of Simple Beaute funds.  Mr. McFadin apparently created and managed the Simple Beaute website and may have assisted some in the Simple Beaute office with such things as transporting books.  Mr. McFadin received monthly payments from Simple Beaute which were classified as "outside services" in Simple Beaute's books and records.  No taxes were withheld from these payments.  Although Mr. McFadin was originally paid on an hourly basis for services he rendered to Simple Beaute, Mr. McFadin switched to a set amount each month and these amounts eventually escalated to $7,000.00 per month.[88] Moreover, in addition to the "routine monthly payments," Mr. McFadin received extra payments and doubling of payments totaling

---

[86] *See* Plaintiffs' Exhibit 160(18).  *See also* Plaintiffs' Exhibit 160(61).

[87] *See* Plaintiffs' Exhibit 160(50).

[88] *Id.*

$39,500.00.[89]

### j.)   "Suspect" Office Expenses

41.   Almost $92,000.00 of Simple Beaute's funds was spent on "office expenses."[90]   Of this amount, almost $50,000.00 was reclassified in 2003 as an account receivable owed by the Debtor.[91] The expenses under this category include the following: Weight Watchers, Newbury Comics, Boutique Pet Shop, Overstock, Restoration Hardware, Bed Bath & Beyond, Redenta's (organic nursery), Gardner Supply (online garden supply co.), Smith & Hawken (home and garden décor), and many others.[92]

### k.)   Other Miscellaneous Expenditures

42.   The Debtor received $7,500.00 in payments that were classified as "outside services," and approximately $27,000.00 in "guaranteed partner payments," even though Simple Beaute's Partnership Agreement does not authorize such payments.[93]

### l.)   Payments of Simple Beaute's funds to Beauté Now, Inc.

43.   From June 2003 through December 2006, $117,367.75 of Simple Beaute's funds were paid to an entity known as Beauté Now,

---

[89] *See* Plaintiffs' Exhibit 171, schedule A.

[90] *See* Plaintiffs' Exhibit 160(48).

[91] *Id.*

[92] *Id.*

[93] *See* Plaintiffs' Exhibit 160(50-51).

Inc. ("Beaute Now").[94] Although these payments were classified in Simple Beaute's accounting books as "outside services," the Debtor testified that the entity known as Beaute Now was established in order to pay for the Debtor's, Ms. Moock's, and Ms. Smyth's uninsured medical expenses such as chiropractic visits. The Ex-Mrs. Mullen was never told about this company and was not offered the option to participate in this company. The Debtor, Ms. Moock, and Ms. Smyth also received salaries from Beaute Now, in addition to payment of medical expenses.[95]

D. *The Ex-Mrs. Mullen's Discovery of the Unauthorized Use of Simple Beaute's Funds and the Formation of HCM Holdings, LLC*

44. The Ex-Mrs. Mullen credibly testified that, during the existence of Simple Beaute, the Debtor told her that the profits would be distributed to the partners, but multiple times the Debtor also told the Ex-Mrs. Mullen that the business was not generating sufficient profit to warrant distributions to the partners. Since the inception of Simple Beaute, the Ex-Mrs. Mullen received only *de minimus* distributions from Simple Beaute. Specifically, the Ex-Mrs. Mullen's partnership draw account in Simple Beaute's accounting records reflects the following distributions for the Ex-Mrs. Mullen's benefit: (a) federal income taxes of $9,189.00 paid in 2003 to the United States Treasury; (b) $10,893.27 in American

---

[94] *See* Exhibit 160(50).

[95] *See* Plaintiffs' Exhibit 183, Plaintiffs' Exhibit 185 & Plaintiffs' Exhibit 186.

Express charges in 2003 made by the Ex-Mrs. Mullen; and (c)
$5,269.10 shown as an unidentified general journal entry at the end
of 2003.[96] While not listed in Simple Beaute's records, the Ex-Mrs.
Mullen also received the benefit of an additional $27,000.00 (for
the personal expenses she charged on her American Express card as
well as an owing account receivable).

45.   The Ex-Mrs. Mullen credibly testified that she did not
discover that the Debtor, Ms. Moock, Ms. Smyth, and Mr. McFadin had
been using Simple Beaute's funds for personal expenses until
January 2007, which is when the Ex-Mrs. Mullen (along with the
assistance of a forensic accountant, Ken Sibley ("Sibley"))
obtained access to the financial records of Simple Beaute.[97]

46.   As a result of the Ex-Mrs. Mullen's and Sibley's
investigation of Simple Beaute's records, the Ex-Mrs. Mullen filed
a state court lawsuit in Dallas County, Texas against the Debtor
(the "State Court Action"). The State Court Action asserted claims
against the Debtor and sought injunctive relief, damages, attorneys
fees, and other relief. The state court granted the Ex-Mrs.
Mullen's request for a temporary restraining order and ultimately
a temporary injunction enjoining the Debtor and others from

---

[96] *See* Plaintiffs' Exhibit 171, schedule D.

[97] The Debtor testified that the Ex-Mrs. Mullen knew he and the others were
using Simple Beaute for personal expenses. The court does not find this
credible given, among other things, her lack of day-to-day involvement with
the company and due to the fact that she lived in Aspen, Colorado during much
of the time the personal expenditures were taking place.

improper uses of Simple Beaute's funds and property.

47. Once the Ex-Mrs. Mullen brought suit against the Debtor and others for their misappropriation of partnership funds and assets, the Debtor shut down Simple Beaute (it is unclear exactly when Simple Beaute was shut down—the Debtor testified it happened in 2008) and summarily disposed of Simple Beaute's assets, and began duplicating the Simple Beaute business model under the name "Robert Jones Beaute." First, with the Debtor's permission, Mr. McFadin filed assumed name certificates with the Texas Secretary of State and the Dallas County Clerk in February and March of 2008, claiming the trade name "Robert Jones Beauty."[98] Second, Mr. McFadin shut down Simple Beaute's website and opened a new website entitled "Robert Jones Beaute"[99] (which, according to the Debtor's own testimony at Trial, promotes some of the same products as did the Simple Beaute website). Then, on July 25, 2007, Mr. McFadin formed HCM Holdings, LLC ("HCM"). In March of 2009, HCM leased the same office space that Simple Beaute had been using.

48. The Debtor eventually wrote a book for HCM called "Looking Younger."[100] While HCM itself entered into a contract with Rockport Publishers, Inc. (a Fair Winds Press company) (the "Book Publisher") for "Looking Younger," which called for the Debtor to

---

[98] *See* Plaintiffs' Exhibit 24 & Plaintiffs' Exhibit 28.

[99] *See* Plaintiffs' Exhibit 25.

[100] *See* Plaintiffs' Exhibit 199.

write the book, the Debtor personally guaranteed performance of the publishing contract and in writing represented to the Book Publisher that he had an interest in HCM.[101] Furthermore, under the book publishing contract, the Debtor was the owner of the copyright on Looking Younger and a copyright was registered with the United States Copyright office in the Debtor's name.[102] However, the royalty rights were promised to HCM under the publishing contract.[103]

49. In March of 2008, the Debtor also permitted HCM to contract with the Book Publisher to combine two of Simple Beaute's previous books into a new book called "Ultimate Makeovers" to be sold at Barnes & Noble.[104] HCM, not the Debtor (and not Simple Beaute, for that matter), received a royalty payment of around $10,000 on the publication of this book.[105]

E.    *The Sibley Expert Report and Testimony*

50. As mentioned above, the Plaintiffs retained a forensic accountant to assist them in understanding what had happened with Simple Beaute and if it was reasonable or reliable to conclude that it had earned no profits. Sibley testified at Trial, with a great

---

[101] *See* Plaintiffs' Exhibits 42-43.

[102] *See* Plaintiffs' Exhibit 271.

[103] *See* Plaintiffs' Exhibit 42.

[104] *See* Plaintiffs' Exhibit 44.

[105] *See* Plaintiffs' Exhibit 45.

deal of credibility and obvious knowledge of proper accounting practices, the Internal Revenue Code, and reasonable business practices. Sibley's testimony was supported by a report with hundreds of pages of analysis, graphics and supporting documentation. Sibley credibly testified that he and his staff spent more than 1,000 hours attempting to reconstruct what happened with Simple Beaute.

51. Distilled to its essence, Sibley's very credible testimony was that: (a) the records of Simple Beaute were in very poor shape (they were either nonexistent in some cases, or where in existence, lacked any integrity and did not reflect the true operations of the company); (b) there was massive misuse of funds and reporting of improper business expenses (expenses that did not meet the standard of reasonableness under the Internal Revenue Code and did not fit within a reasonable standard when properly focusing on the business purpose of Simple Beaute—which was to produce, market, and distribute Simple Beaute books and other products, in contrast to the Debtor's separate job/business purpose of doing styling/makeup jobs); (c) there was also insufficient documentation of expenses on a widespread basis (only credit card statements and bank statements; no invoices or receipts), so that even potentially legitimate business expenses could not be justified to the Internal Revenue Service; and (d) the overall integrity of bookkeeping was utterly lacking.

52.  Sibley went though the Simple Beaute records—as woefully lacking as they were—in painstaking detail and put together a list of alleged expenses/expenditures that he believed were "improperly" charged to Simple Beaute between the years 2001-2006 (totaling $1,570,551.27), and yet additional expenses that he believed were "questionable" between 2001-2006 (totaling $390,252.57). Additionally, Sibley's list highlights an account receivable owed by the Debtor to Simple Beaute, booked in the amount $142,769.40, which was never repaid and the evidence reflected represented personal expenditures of Simple Beaute funds by the Debtor.  The court believes that this Sibley report shows, by a preponderance of the evidence, that at least **$1,713,320.67** of funds of Simple Beaute ($1,570,551.27 plus $142,769.40) were misappropriated by or with the consent of the Debtor and to the detriment of the Ex-Mrs. Mullen.  The court will not make such a finding with regard to the "questionable" expenses.

F. _The Debtor's Bankruptcy Filing_

53.  On November 20, 2008, the Debtor filed a petition for bankruptcy under chapter 7 of the Bankruptcy Code.  The Plaintiffs' complain that the Debtor's initial bankruptcy schedules omitted the following assets and liabilities:

(a) The Debtor did not disclose that he might have an interest in HCM, a company that Mr. McFadin legally owns, but to which the Debtor has contributed his name and work product, with no

-44-

compensation;

(b)  The  Debtor  did  not  disclose  that  he  had  a  guaranty obligation  owed  to  the  Book  Publisher  whereby  the  Debtor  guaranteed all  obligations  of  HCM  under  the  August  10,  2007  publishing agreement  between  HCM  and  the  Book  Publisher;

(c)  The  Debtor  did  not  disclose  that  he  owned  a  copyright  in and  related  software  to  (1)  "Beaute  Made  Simple,"  (2)  "Beaute Occasions,  Bridal  Beaute  and  Beyond,"  (3)  software  related  to "Makeup  Makeovers"  and  "Makeup  Makeovers:  Weddings-Stunning  Looks for  the  Entire  Bridal  Party,"  and  (4)  "Looking  Younger;"

(d)  The  Debtor  did  not  disclose  that  he  had  contract  rights with  the  Book  Publisher  that  entitled  him  to  receive  royalties  on books  he  had  written  under  contract  for  the  Book  Publisher, including  the  following  agreements:  (1)  December  15,  2004,  for "Makeup  Makeovers,"  which  has  already  generated  royalty  payments; and  (2)  January  19,  2006  for  "Makeup  Makeovers:  Weddings-Stunning Looks  for  the  Entire  Bridal  Party;"

(e)  The  Debtor  did  not  disclose  that  he  owns  trademarks  for "Robert  Jones  Simple  Beaute"  bearing  serial  numbers  76534551, 76534553  and  76534554  registered  with  the  United  States  Patent  and Trademark  Office;

(f)  The  Debtor  did  not  disclose  that  he  has  collectible (Madame  Alexander)  dolls;

(g)  The  Debtor  did  not  disclose  that  he  had  possession  of

-45-

clothes and furniture at this home in Dallas, Texas which were acquired with Simple Beaute funds and never returned; and

(h) The Debtor did not disclose that he was a party to a lease of an apartment in New York City and had furniture and furnishings in the apartment which were purchased with Simple Beaute funds and never returned to Simple Beaute.

54. The Debtor did file amended Schedules during the Trial of this Adversary Proceeding in order to provide additional information on some of these copyrights, the previously undisclosed trademarks, and the undisclosed Madame Alexander dolls.

55. There is also additional evidence that $27,460.95 in royalty payments on the Debtor's first professionally published book, "Makeup Makeovers," which was published while the Debtor was a partner of Simple Beaute (in 2005), were diverted to HCM from October 30, 2008 through May 7, 2009. After discovery took place in this Adversary Proceeding, this discovery of diverted funds was made and the Debtor testified that he ultimately delivered $18,297.10 to the Chapter 7 bankruptcy trustee. However, the Debtor has still failed to remit the $9,162.85, which was shown to be paid by the Book Publisher to HCM on account of the book "Makeup Makeovers."

### III. CONCLUSIONS OF LAW

A.  *Does the Debtor Owe a Non-Dischargeable Debt to the Ex-Mrs. Mullen Pursuant to 11 U.S.C. § 523(a)(4)?*

Section 523(a)(4) of the Bankruptcy Code provides that "[a]

discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (2010). The standard of proof in any action under Section 523(a) of the Bankruptcy Code is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). The court does not believe that "larceny" or "embezzlement" have been shown to have occurred in the case at bar.[106] Rather, the pertinent questions are: (a) whether the Debtor was acting in a "fiduciary capacity" *vis-a-vis* the Ex-Mrs. Mullen for purposes of Section 523(a)(4) of the Bankruptcy Code; (b) if so, whether the Debtor committed "fraud or defalcation" acting in that fiduciary capacity; and (c) if so, whether a "debt" has arisen owing from the Debtor to

---

[106] The term larceny is interpreted under federal common law, rather than state law definitions of larceny. *Clarendon Nat'l Ins. Co. v. Barrett (In re Barrett)*, 156 B.R. 529, 533 n. 3 (Bankr. N.D. Tex. 1993). Under federal common law, larceny has been defined as the "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Id.* Clearly, "larceny" did not occur in the case at bar, because the property of Simple Beaute that the Debtor is alleged to have misappropriated/wrongly expended came into the Debtor's hands **lawfully**. In contrast to larceny, "embezzlement" has been defined as "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998), *cert. denied,* 526 U.S. 1016 (1999). In other words, there is no **unlawful taking** at the outset, as with larceny. Nevertheless, in order to prove embezzlement, there must be proof that the creditor entrusted his property to the debtor, that the debtor appropriated the property for use other than that for which it was entrusted, and that there was **intent to defraud** on the part of the debtor. *Id.* at 603. The court, here, has not been convinced there was any **intent to defraud** the Ex-Mrs. Mullen on the part of the Debtor (with regard to the use of Simple Beaute funds). Rather, the court believes that there was a wrongful appropriation of Simple Beaute property accompanied by an **erroneous and unreasonable belief of entitlement**. But this does not equate to the fraudulent intent necessary to establish embezzlement.

the Ex-Mrs. Mullen as a result of the defalcation while acting in a fiduciary capacity (and, if so, how much)?

### i.   The "Fiduciary Capacity" of the Debtor Vis-a-Vis the Ex-Mrs. Mullen.

#### a.)   Definition of a "Fiduciary."

The term "fiduciary," according to Black's Law Dictionary, is derived from Roman law, and means "a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires."  Black's Law Dictionary 563 (5th ed. 1979).   Moreover, one is acting in a "fiduciary capacity" when "the business which he transacts, or the money or property which he handles, is not his own or for his benefit, but for the benefit of another person, as to whom he stands in a relation implying or necessitating great confidence and trust on the one part and a high degree of good faith on the other part."  *Id.*  Justice Cardozo is often quoted for having described the "fiduciary" concept as follows:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive is then the standard of behavior.

*Meinhard v. Salmon*, 249 N.Y. 458, 464 (N.Y. 1928).[107]  Notably, the

---

[107] Justice Cardozo again famously wrote about fiduciaries in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934) (writing about the predecessor-statute of Section 523(a)(4) that appeared in the Bankruptcy Act of 1898, §

concept of "fiduciary capacity," under the common law (wherein the concept has evolved and been refined—much more so than in statute), is not necessarily "restricted to technical or express trusts." *Id.* However, the Fifth Circuit has opined that the standard for "fiduciary capacity," as used in Section 523(a)(4) of the Bankruptcy Code, is stricter or narrower than the concept has been defined in the general common law. *Miller,* 156 F.3d at 602. As used in Section 523(a)(4) of the Bankruptcy Code, "fiduciary" is, indeed, "limited to instances involving express or technical trusts." *Id.* In other words, a mere constructive or implied trust is not enough for purposes of Section 523(a)(4) of the Bankruptcy Code. *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1339 (5th Cir. 1980). However, there need not be a written agreement creating the express trust arrangement; the express trust often exists by virtue of a statute or common law. *LSP Inv. Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 789 (5th Cir. 1993), *cert denied*, 510 U.S. 1011 (1993). Further, in determining whether a particular debtor was acting in a fiduciary capacity for purposes of Section 523(a)(4) of the Bankruptcy Code, a court should consult both state and federal law. *Id.* at 785. While the concept of "fiduciary capacity," pursuant to Section 523(a)(4) of the Bankruptcy Code, is a question of federal law, state law is nevertheless important in determining whether or not a trust

---

17, 30 Stat. 544, 550, formerly codified at 11 U.S.C. § 35, repealed 1978).

obligation exists. *Id. See also Gupta v. E. Idaho Tumor Insti.,*
*Inc. (In re Gupta),* 394 F.3d 347, 350 (5th Cir. 2004). But, as set
forth above, at the end of the day, "fiduciary," as used in Section
523(a)(4) of the Bankruptcy Code, is a narrower notion than in some
other contexts in the law. A common example given in the case
law—of when there might be a fiduciary relationship pursuant to
statute or common law that is not sufficient to meet the
"fiduciary" standard of Section 523(a)(4) of the Bankruptcy Code—is
the *ex maleficio* trust, whereby a fiduciary relationship is created
**in response** to some sort of wrongdoing. *See discussions* in *In re*
*Hurbace*, 61 B.R. 563, 566 (Bankr. W. D. Tex. 1986) and *Ragsdale v.*
*Haller*, 780 F.2d 794, 796 (9th Cir. 1986). For purposes of Section
523(a)(4) of the Bankruptcy Code, the fiduciary relationship must
pre-date the wrongdoing. *See Bennett*, 989 F.2d at 784; *Gupta*, 394
F.3d at 350.

> b.) Directors and Officers of Corporations as
> Fiduciaries.

The Debtor in the case at bar, as an officer (*i.e.,* President)
and director of the Corporate GP, clearly, pursuant to Texas common
law,[108] stood in a pre-existing fiduciary relationship to the

---

[108] Note that the court has referenced "Texas common law." Obviously, there is
a large body of **statutory** law in Texas that deals with the subject of
corporations and their management, which is now mostly embodied in the Texas
Business Organizations Code (eff. Jan. 1, 2010) (replacing, among other
statutes, the Texas Business Corporation Act, expired eff. Jan 1, 2010).
Significantly, the provisions of the Texas Business Organizations Code and the
Texas Business Corporation Act do **not** define or expressly impose a fiduciary
relationship or specific fiduciary duties upon directors and officers of a
corporation, but numerous provisions of these statutes do implicitly recognize

Corporate GP and to the Corporate GP's shareholders, and the Ex-Mrs. Mullen was a shareholder of the Corporate GP.  *See Faour v. Faour*, 789 S.W.2d 620, 621 (Tex. App.—Texarkana 1990, writ denied)(under Texas law, a corporate officer or director owes a fiduciary duty to the corporation); *Hughes v. Houston Northwest Medical Ctr., Inc.*, 680 S.W.2d 838, 843 (Tex. App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.), *cert. denied*, 474 U.S. 1020 (1985) (the officer or director owes the corporation and the stockholders a duty to act only in their best interests).  The Fifth Circuit has likewise held, in the stricter context of Section 523(a)(4) of the Bankruptcy Code, that an officer of a corporation stands in a fiduciary capacity *vis-a-vis* the corporation and its shareholders. *Moreno v. Ashworth (In re Moreno),* 892 F.2d 417, 421 (5th Cir. 1990).  *See also Am. Metals Corp. v. Cowley (In re Cowley)*, 35 B.R. 526, 528-29 (Bankr. D. Kan. 1983) ("A corporate officer is a fiduciary of a corporation within the meaning of § 523(a)(4). . . ."); *Assurance Sys. Corp. v. Jackson (In re Jackson)*, 141 B.R. 909, 915 (Bankr. N.D. Tex. 1992)(under Texas law, a corporate officer or

---

that such a relationship and duties exist.  Significantly, jurisprudence in the state of Texas has supplemented the statutory law, by generally recognizing that directors and officers do, indeed, stand in a special relationship giving rise to fiduciary duties, and those duties include those of **obedience, care and loyalty** to the corporation and its shareholders.  *See generally Elizabeth S. Miller, Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations* (State Bar of Texas, Essentials of Business Law, Apr. 29-30, 2010, Dallas, Texas).  Note that the Texas statutes permit limitation of the liability of corporate directors within certain parameters, but the statutes do not permit limitation of liability for breaches of the duty of loyalty.  *Id.*  *See also* Tex. Bus. Org. Code § 7.001.

director owes a fiduciary duty to the corporation and has a duty to act only in the corporation's and stockholders' best interests).

> ### c.) General Partner (or Managing General Partner) as a Fiduciary.

Additionally, pursuant to a large amount of Texas **common** law, it would appear that the **Corporate GP** (which was being controlled by the Debtor—as President, director, and 51% shareholder thereof) stood in a pre-existing fiduciary relationship to the limited partners of Simple Beaute, including the Ex-Mrs. Mullen. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998); *Crenshaw v. Swensen*, 611 S.W.2d 886, 890 (Tex. App.—Austin 1980, writ ref'd n.r.e.). The Fifth Circuit has likewise held, in the stricter context of Section 523(a)(4), that there is a fiduciary relationship between a general partner and limited partners that is sufficient under Section 523(a)(4) of the Bankruptcy Code. *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185-86 (5th Cir. 1997). However, before the court further peels back the onion—to determine whether the Debtor, **as manager of** the Corporate GP, would owe fiduciary duties directly to the Ex-Mrs. Mullen—the question of whether a fiduciary relationship existed under Texas state law *vis-a-vis* the Corporate GP and the Ex-Mrs. Mullen requires further scrutiny, in light of significant amendments to Texas statutory partnership law that occurred in 1994 (and thereafter) by virtue of

the Texas Legislature.[109]  Such amendments—without a doubt—impact the analysis of fiduciary duties in the partnership context, but have not yet received much discussion in opinions involving Section 523(a)(4) of the Bankruptcy Code and partnerships.

As mentioned above, Texas **common** law has long broadly stated that there is a fiduciary relationship between general partners and a partnership, and general partners and the limited partners.  *See, e.g., Huffington v. Upchurch*, 532 S.W.2d 576 (Tex. 1976).[110]  But in 1994, the Texas statutory partnership law was materially changed to seemingly eschew some of these notions.  Specifically, the prior Texas Uniform Partnership Act (consistent with cases pre-dating it) provided in Section 21, entitled "***Partner Accountable as a Fiduciary***," that "[e]very partner must account to the partnership for any benefit, and hold ***as trustee*** for it any profits derived by him without the consent of the other partners from any transaction in connection with the formation, conduct, or liquidation of the partnership or from any use by him of its property."  Vernon's Ann. Civ. Stat. art. 6132b, § 21 (expired) (emphasis added).  This was

---

[109] On January 1, 1994, the Texas Revised Partnership Act became effective replacing the Texas Uniform Partnership Act (which was effective from 1962-1999).  Then, on January 1, 2010, the Texas Business Organizations Code became effective as to all manner of business entities in Texas (such Code actually became effective January 1, 2006, as to business entities created after that date and also to pre-existing business entities that elected to be governed thereafter by the Code).

[110] The notion of a fiduciary relationship among partners and partnerships is not just a long-standing fixture in Texas law but nearly everywhere.  Without a doubt, the most-quoted court opinion in this area is that of Justice Cardozo in *Meinhard v. Salmon*.

the only place that the former statute actually used the word "fiduciary," but the case law has been replete with references to the partner as a fiduciary. Then, in 1994, the Texas Revised Partnership Act went into effect, and, in contrast to the prior statute, it specifically set forth the duties of partners in precise terms (setting forth a "duty of loyalty" and a "duty of care," with examples of what each included) and went on to **reject** the notion of a partner being analogous to a trustee:

> Trustee Standard Inapplicable. A partner, in that capacity, is not a trustee and is not held to the same standards as a trustee.

Vernon's Ann. Tex. Civ. Stats. art. 6132b-4.04(a)-(g) (expired Jan. 1, 2010). The intent of the drafters of this new statute was apparently to expunge from the law of partner-duties some of the broad "rhetoric" of prior case law. Specifically, the State Bar of Texas Committee Official Comments explained, "This section defines partnership duties and implies they are not to be expanded by loose use of 'fiduciary' concepts from other contexts or by the rhetoric of some prior cases." *Id.*, Comment of Bar Committee-1993. Next, fast-forward approximately ten years. In 2003, the Texas Business Organizations Code was enacted, codifying prior acts, including the Texas Revised Partnership Act. It was effective January 1, 2006, as to entities created thereafter and also as to any pre-existing entities that elected to be governed by the new Code, and became effective as to all business entities on January 1, 2010. The

Texas Business Organizations Code embodies nearly identical language to the Texas Revised Partnership Act cited above—specifically delineating partner-duties of "care" and "loyalty" (and what they include) but stating that:

> A partner, in the partner's capacity as partner, is not a trustee and is not held to the standards of a trust.

Tex. Bus Orgs. Code, § 152.204(a)-(d).

As mentioned above, very little case law has addressed the significance of these changes. The opinion that seems to have come closest to confronting it was *Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347 (5th Cir. 2004). *Gupta* involved a Section 523(a)(4) adversary proceeding in which the plaintiff had been a co-venturer with the Chapter 7 debtor and had obtained a prepetition money judgment against the debtor for breach of fiduciary duty. The issue before the Fifth Circuit (and lower courts) had been whether certain state court findings regarding the "relationship of trust and confidence" between the plaintiff and debtor and that the debtor had breached "fiduciary duties," barred re-litigation in the bankruptcy court and compelled a conclusion that the judgment was nondischargeable, pursuant to Section 523(a)(4) of the Bankruptcy Code. The Fifth Circuit determined that the state court findings were insufficient to warrant collateral estoppel, because it was unclear that the facts actually litigated and decided by the jury comported with the new modified Texas partnership standards and, even if they did, the findings

-55-

would still have to be viewed through the lens of the narrower federal law as to fiduciary capacity. *Id.* at 352. In *Gupta*, the Fifth Circuit did not tackle the meaning or the ramifications of the new Texas partnership law, for purposes of "fiduciary capacity" of partners and Section 523(a)(4) of the Bankruptcy Code. The Fifth Circuit merely noted that partners still owe "special duties to each other"; "certain duties that partners owe to each other may rise to the level of a 'fiduciary' for purposes of § 523(a)(4)"; and [i]t would appear that, at least as to the duty to account for money owed to the partnership, a partner's duties may constitute a pre-existing, express or technical trust . . . and are analogous to those of the corporate officers in *Davis* and *Moreno*." *Id.* at 351-52.[111]

This court believes that the Corporate GP did, in fact, owe fiduciary duties to the Ex-Mrs. Mullen in its role of **managing general partner of Simple Beaute.** The new statutory language does, without a doubt, make clear that a partner is not *per se* a fiduciary, or in a trust-like relationship, merely by virtue of being a partner. "A partner*, in that capacity*, is not a trustee and is not held to the same standards as a trustee." Vernon's Ann.

---

[111] Interestingly, a few years later, in a case called *McBeth* (a diversity case in the federal court system, involving claims of breach of fiduciary duty, common law fraud and other state law torts, filed by limited partners against the control person of the limited partnership), the Fifth Circuit did not even mention the relevance of the partnership statute changes, and stated that, under Texas law, **all** partners in a partnership are fiduciaries to each other-even limited partners. *McBeth v. Carpenter*, 565 F.3d 171, 177-178 (5th Cir. 2009).

Tex. Civ. Stats. art. 6132b-4.04(a)-(g) (expired Jan. 1, 2010) (emphasis added). A "partner, *in the partner's capacity as partner*, is not a trustee and is not held to the standards of a trust." Tex. Bus Orgs. Code, § 152.204(a)-(d) (emphasis added). This modification in the law would seem to put partners and partnerships on a parity with shareholders and corporations. The law in the corporate world has long been that shareholders generally do not owe other shareholders fiduciary duties. *See Hoggett v. Brown,* 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Schoelkopf v. Pledger*, 739 S.W.2d 914, 920 (Tex. App.–Dallas 1984), rev'd on other grounds, 762 S.W.2d 145 (Tex. 1988).[112] But, even in the corporate world, the law is less clear in the situation of a majority and minority shareholders and controlling shareholders. *See Hoggett*, 971 S.W.2d at 488, n.13; *Schautteet v. Chester State Bank*, 707 F. Supp. 885, 888 (E.D. Tex. 1988); *Flanary v. Mills,* 150 S.W.3d 785, 794-95 (Tex. App.—Austin 2004, pet. denied).[113] It appears that these relationships can, in fact, give rise to fiduciary duties. And, of course, as discussed above, directors and officers owe fiduciary duties to the

---

[112] Similarly, the law also seems to be developing toward the notion that *members of a limited liability company* do not necessarily owe *other members* fiduciary duties. *See Suntech Processing Sys., L.L.C. v. Sun Commc'ns, Inc.,* No. 05-99-00213, 2000 WL 1780236 (Tex. App.—Dallas Dec. 5, 2000, pet. denied); *Gadin v. Societe Captrade*, No. 08-3773, 2009 WL 1704049 (S.D. Tex. Jun. 17, 2009).

[113] *See generally Elizabeth S. Miller, Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations* (State Bar of Texas, Essentials of Business Law, Apr. 29-30, 2010, Dallas, Texas).

corporation and shareholders. The key issue in each situation would seem to be **control**.

The control factor seems to have been alluded to somewhat in *Gupta,* as likely having relevance after the changes in Texas statutory law (after quoting the State Bar Comments, the *Gupta* court stated that "[t]his is not to say that Texas partners no longer owe special duties to each other"; "certain duties that partners owe to each other may rise to the level of 'fiduciary'"; further speculating that "the duty to account for money owed to the partnership" may constitute a "pre-existing, express or technical trust . . . analogous to those of the corporate officers" articulated in certain Fifth Circuit cases dealing with Section 523(a)(4)). *Gupta*, 394 F.3d at 351-52. Moreover, there is a long-standing body of jurisprudence in Texas that cannot be ignored that holds that a **managing** partner of a partnership (similar to an officer or director of a corporation) owes fiduciary duties to the partnership and partners. *E.g.*, *McBeth*, 565 F.3d at 177 ("Texas courts have long held that '[i]t is axiomatic that a managing partner in a general partnership, owes his co-partners the highest fiduciary duty recognized in the law.'") (citing *Crenshaw*, 611 S.W.2d at 890); *Bennett*, 989 F.2d at 787 ("Texas law clearly and expressly imposes trust obligations on managing partners of limited

partnerships").[114]

This court ultimately concludes that the changes in Texas statutory partnership law in recent years—expunging the fiduciary concept as to partners **in their capacity as mere partners**—do not appear to have expunged the concept of a **managing general partner** being a fiduciary. Again, the case law seems clear that it is the "control" factor—and the confidence and trust that other partners place in the hands of the one in control—that gives rise to the fiduciary relationship. *McBeth,* 565 F.3d at 177 ("It 'is clear that the issue of control has always been the critical fact looked to by the courts in imposing this high level of responsibility.'") (citing *Bennett*, 989 F.2d at 789). Thus, here, notwithstanding the changes to Texas statutes, the court concludes that the Texas common law that holds that there is an express trust, that reaches the strict test of Section 523(a)(4) for "fiduciary capacity," is still good law in the context of a **managing** partner of a partnership.

> d.) <u>The Significance (or Lack Thereof) of the Two-Tiered Structure of Simple Beaute.</u>

Having determined that **the Corporate GP** owed fiduciary duties to Simple Beaute and the Ex-Mrs. Mullen, this still begs the question of whether **the Debtor** owed fiduciary duties **directly** to the Ex-Mrs. Mullen (because of, perhaps, standing concepts and

---

[114] *Bennett* (decided before the new partnership law) had declined to rule on whether co-equal partners hold duties to each other that are "fiduciary."

derivative action requirements, and/or because of the two-tiered entity structure here, whereby the Debtor is actually the **manager of the managing general partner** of Simple Beaute, rather than him personally being the managing general partner). That question should be considered answered by the cases of *Bennett* and *McBeth*.

In the case of *Bennett*, mentioned above, a Section 523(a)(4) adversary proceeding was brought to determine the dischargeability of a debt owed allegedly to certain limited partners of a limited partnership (the "LP-Mariner") by a debtor ("Mr. Bennett") who had been a managing general partner of yet another managing general partner (the "GP-No. 20") of the LP-Mariner. The purpose of the LP-Mariner had been to construct, furnish and operate a first-class Marriott hotel. The partnership agreement had provided that the LP-Mariner would borrow $22 million to construct the hotel, and the GP-No. 20 would contribute further funds to construct and furnish the hotel if the $22 million was insufficient. Further, the GP-No. 20 would be able to pay itself up to $4 million of a cash distribution if the hotel came in below the $22 million budget. The facts described in *Bennett* further reveal that, at some point during the construction process, yet a third-tier in the partnership structure was injected, when the debtor, Mr. Bennett, had retained a corporation that he 100%-owned to perform the duties of GP-No. 20. Thus, in *Bennett*, there was actually a three-tier partnership structure (*i.e.,* Mr. Bennett was acting as the

manager/control person of a corporation that was, in turn, controlling the general partner of the limited partnership). In any event, the facts further reveal that things went awry when, after what appeared to be a successful completion of the hotel under-budget, and after Mr. Bennett made a $1 million distribution to himself because of that, mildew problems were discovered within the hotel. As it turned out, $72,000 of repairs were incurred because of the mildew problems, and these were improperly charged to the LP-Mariner (when it was the obligation of the GP-No. 20 to pay for these under the partnership agreement). Further, it was later discovered that $832,204.40 had been wrongly charged to the LP-Mariner for equipment/leases at the hotel (which should have been paid for by the GP-No. 20). When Mr. Bennett later filed bankruptcy, certain limited partners claimed that he personally had committed defalcation while in a fiduciary capacity (by misapplying partnership funds).

While the bankruptcy court and district court found that there could be no nondischargeable debt owing by Mr. Bennett, determining that the multi-tiered partnership structure shielded Mr. Bennett from personally owing fiduciary duties to the limited partners of the LP-Mariner, the Fifth Circuit disagreed and reversed. Calling *Bennett* a case of first impression in this regard, the Fifth Circuit indicated that the first question it had before it was whether "the scope of the fiduciary duty owed by the managing

general partner of a limited partnership to the limited partners is sufficient to meet the narrow requirements of section 523(a)(4)." *Bennett*, 989 F.2d at 783. Next, if such a duty was sufficient under Section 523(a)(4) of the Bankruptcy Code, the court would have to decide if the same duty applied to "the managing partner of a managing partner." *Id.* After extensive analysis of various case law, the Fifth Circuit first concluded that Texas law "clearly and expressly imposes trust obligations on managing partners of limited partnerships and these obligations are sufficient to meet the narrow requirements of section 523(a)(4)." *Id.* at 787 (citing primarily *Crenshaw,* 611 S.W.2d at 886).[115] Moreover, the court held that the same level of fiduciary duty should be deemed to apply with regard to ***a managing partner of a managing partner***, since the line of cases that hold that a managing partner of a partnership owes to the partners "the highest fiduciary obligations known at law," makes clear that the issue of "control" is "the critical fact looked to by the courts in imposing this high level of responsibility." *Bennett*, 989 F.2d at 789. Therefore, the court determined that the debtor—Mr. Bennett, as the managing partner of the managing partner—owed to the limited partners "the highest fiduciary duty recognized by law" and such duty was sufficient to meet the requirements of Section 523(a)(4) of the Bankruptcy Code.

---

[115] As earlier mentioned, *Bennett* was decided in 1993, before the changes to the Texas partnership law.

*Id.* at 790. The Fifth Circuit also cited with approval *Park v. Moorad*, 132 B.R. 58, 63 (Bankr. Ok. 1991), wherein a debtor who was the president, director and sole shareholder of a corporation, which in turn was the general partner of a limited partnership, was held to owe to the limited partners of the partnership the type of fiduciary duty contemplated under Section 523(a)(4) of the Bankruptcy Code, with the court stating that the debtor would not be allowed to "hide beneath a corporate shell when he so completely controlled the corporate actions, representations, and decisions that in effect it had no life without him." *Id.*

Recently in the case of *McBeth*, the Fifth Circuit—in a non-Section 523(a)(4) context—again held that the person or entity acting in complete control of a limited partnership stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiary of a trust, and this is so even where there is "a two-tiered partnership structure" where an individual is acting as the "managing partner of a managing partner." *McBeth*, 565 F.3d at 177.

In summary, the court concludes that the Debtor was in a fiduciary capacity *vis-a-vis* the Ex-Mrs. Mullen for purposes of Section 523(a)(4) of the Bankruptcy Code. In fact, the court concludes that the Debtor owed fiduciary duties to the Ex-Mrs. Mullen through at least two different avenues: (a) in his capacity as an officer and director of the Corporate GP (since all officers

and directors of a corporation owe fiduciary duties to the corporation and its shareholders, and the Ex-Mrs. Mullen was a shareholder of the Corporate GP); and (b) in his capacity as the control person/manager of the general partner of Simple Beaute (since, under Texas law, it appears that *managing* partners still owe fiduciary duties to partnerships and their limited partners, and this concept applies even in a two-tiered structure where an individual is acting as the manager of the managing general partner).

### ii. Did the Debtor Commit Fraud or Defalcation While in the Fiduciary Capacity?

Having decided that the Debtor served in a "fiduciary capacity" (*i.e.,* directly owed fiduciary duties) as to the Ex-Mrs. Mullen, the court next must turn to the question of whether fraud or defalcation was committed by the Debtor in this capacity. The Fifth Circuit's *Bennett* case, discussed above, is also helpful on this point. *Bennett,* 989 F.2d at 789. Recall that, similar to the case at bar, *Bennett* was a case construing Section 523(a)(4) of the Bankruptcy Code and involving a debtor who was a managing partner of a managing partner of a limited partnership. And similarly there, certain limited partners of the limited partnership were attempting to obtain a ruling that the debtor had breached fiduciary duties owed to them, which was tantamount to a "defalcation," and, thus, the debtor owed them a nondischargeable

-64-

debt.

The Fifth Circuit stated in *Bennett* that a defalcation is a "willful neglect of duty even if not accompanied by fraud or embezzlement." *Id.* at 790 (citing *Moreno*, 892 F.2d at 421). *See also Sierra Inv. Assoc. v. Tomlin (In re Tomlin)*, No. 99-3485, 2005 WL 6440629, *12 (Bankr. N.D. Tex. 2005) (Judge B. Houser) (a "breach of fiduciary duty will constitute defalcation for purposes of § 523(a)(4) where the breach is willful"). Moreover, "willful neglect of fiduciary duty" is essentially a "recklessness" standard. *Id. See also Schwager*, 121 F.3d at 185 (unlike fraud, defalcation does not require actual intent; rather, defalcation only requires reckless conduct by the debtor). Additionally, willfulness is further "measured objectively by what a reasonable person in the debtor's position knew or reasonably should have known." *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001), *cert. denied*, 534 U.S. 1078 (2002). *See also Tomlin*, 2005 WL 6440629, at *12.

**Thus, combining these holdings, this court must determine whether: (a) the Debtor breached or neglected fiduciary duties; (b) he was at least reckless in doing so; and (c) a reasonable person in the Debtor's position reasonably should have known.**

As far as whether there was a breach or neglect of fiduciary duties, under Texas common law, three broad fiduciary duties stem from the status of being a corporate officer or director:

-65-

obedience, loyalty, and due care. *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004). The duty of loyalty, in particular, dictates that a corporate officer or director must act in good faith and must not allow his or her personal interests to prevail over the interests of the corporation. *Id.* The duty of loyalty is described as requiring an extreme measure of candor, unselfishness, and good faith on the part of the officer or director. *Id.*

Similar to a corporate officer or director, a partner to a partnership statutorily owes duties of "loyalty" (including a duty to account to the partnership for property and profits; refrain from dealing with the partnership on behalf of a party having an adverse interest; and refrain from competing in a manner adverse to the partnership) and of "care," and must discharge these duties with good faith. *See* Tex. Bus. Orgs. Code, § 152.204-15.205 (eff. Jan. 1, 2010 for all business entities in Texas); and Vernon's Ann. Tex. Civ. Stats. art. 6132b-4.04(a)-(g) ("Texas Revised Partnership Act") (expired Jan. 1, 2010).[116] Case law has further spoken of duties of utmost good faith, fairness, and honesty on the part of a partner in his dealings with the partnership and its partners. *See Bohatch*, 977 S.W.2d at 545; *Hawthorne v. Guenther*, 917 S.W.2d

---

[116] The Texas Revised Partnership Act would have been the applicable statute with regard to Simple Beaute, given that the partnership was formed in 2001 and the acts involved here occurred between 2001-2008 (and there was no evidence that Simple Beaute elected to be governed by the Texas Business Organization Code after January 1, 2006).

924, 934 (Tex. App.—Beaumont 1996, writ denied) (stating that, among the duties that a partner owes to its co-partners is the duty of "full disclosure of all matters affecting the partnership"). Additionally, when a general partner is in complete control of the assets and affairs of a limited partnership, as a managing partner, it appears that his fulfilment of these duties must be measured by standards exacting the utmost fidelity—as a fiduciary—and not only is his duty to administer the partnership's affairs solely for the benefit of the partnership, but he is not permitted to place himself in a position where it would be for his own benefit to violate this duty. *Crenshaw*, 611 S.W.2d at 890.

The court finds and concludes that the Debtor committed defalcation while acting in his fiduciary capacity. Specifically, the Debtor was "in control," for all intents and purposes, of Simple Beaute. The Debtor was charged with prudent management of the Partnership (under the Partnership Agreement) and, indeed, enjoyed full, exclusive, and complete control to make decisions affecting Simple Beaute and to effectuate its purposes. The Debtor was the only party with this actual control. While there were other officers of the Corporate GP, and the Ex-Mrs. Mullen was nominally a director of the Corporate GP for several years, the Ex-Mrs. Mullen was not being asked to perform (nor was she performing) any daily duties at Simple Beaute, nor was she being consulted with regard to expenditures of funds or any day-to-day business of

-67-

Simple Beaute, nor were any board meetings being held. While in his role of control, the Debtor willfully (*i.e.,* at least recklessly—per the Fifth Circuit's standard in *Schwager*) neglected his fiduciary duties. The Debtor's lack of fraudulent intent and apparent lack of business savvy do not matter,[117] because a reasonable person should have known better. *Felt*, 255 F.3d at 226. The actions that amounted to defalcations were the Debtor's habitual spending of Simple Beaute's monies for his own personal benefit, as set forth in detail above, and his permitting others (Mr. McFadin, Ms. Moock, and Ms. Smyth) to do the same. A reasonable person would have known that it was not proper to charge spa treatments, personal vacations to island resorts and the Magic Kingdom, clothing, jewelry including his and his partner's civil-union rings, personal home renovations, a car, and regular meals and alcoholic beverages at high-end establishments (where no client was involved) as "business expenses." The evidence did not remotely suggest that there was any legitimate business purpose for the personal expenditures of the Debtor, Ms. Moock, and Ms. Smyth. The Debtor did not simply spend partnership funds for personal use one or two times, perhaps by reasonable mistake; the Debtor did it again and again and again. It was his, Ms. Moock's, and Ms.

---

[117] While the Debtor is somewhat lacking in business savvy, the court notes that he did credibly testify that he knew he had a duty of loyalty and to exercise care, from the beginning of his involvement with Simple Beaute and the Corporate GP. *See* Testimony of the Debtor at Trial on October 19, 2009.

Smyth's *modus operandi*, for several years, to treat the Simple Beaute funds as their very own.  Spending partnership funds for one's lavish lifestyle is not administering the Partnership's affairs solely for the benefit of the Partnership.  *See Crenshaw*, 611 S.W.2d at 890.  Nor was the Debtor, by any reasonable interpretation, acting in accordance with the Partnership Agreement[118] and abiding by his legal duty not to misapply funds. Nor was the Debtor, in doing these things, acting with the utmost good faith, fairness, and honesty in his dealings with the partnership and its partners.  *See Bohatch*, 977 S.W.2d at 545.  Nor was the Debtor making "full disclosure of all matters affecting the partnership" when dealing with the Ex-Mrs. Mullen.  *See Hawthorne*, 917 S.W.2d at 934.[119]

---

[118] Section 4.1 of the Partnership Agreement gave the Corporate GP complete and exclusive management and control of Simple Beaute, obligating it to use the "best efforts to carry out the purposes" of Simple Beaute and the ability to "incur all reasonable expenditures" which the Corporate GP considered "necessary, proper or desirable to carry out the business of" Simple Beaute. Section 4.3 of the Partnership Agreement further obligated the Corporate GP to "manage the Partnership affairs in a prudent and businesslike manner." Section 4.8 prohibited reimbursement for any portion of the Corporate GP's "corporate overhead or the salaries of corporate employees."

[119] The Debtor testified multiple times that he thought some of his personal expenditures, such as clothes and spa visits, were reasonable because his image and well-being very much matter, in light of the public appearances he makes in the beauty industry.  Moreover, since he and Ms. Moock and Ms. Smyth were not getting compensated for their services by Simple Beaute, he seemed to think that they deserved all the personal perqs.  First, much of this testimony lacks credibility—in the court's estimation.  The court finds it impossible to believe that **anyone** would think such things as back waxes, massages, jewelry for one's significant other, and free trips to the Magic Kingdom for family members, were legitimate business expenses.  Second, not only did the Debtor agree to no salaries in the Partnership Agreement, but this was hardly a situation where the Debtor and his friends, Ms. Moock and Ms. Smyth, were income-less.  The Debtor was earning a personal fee of $1,500-$2,500 per Mary Kay workshop (on average there were 55 of these per year), plus he still worked as a hair stylist and makeup artist doing other "gigs."

### iii. What "Debt" has Arisen Owing from the Debtor to the Ex-Mrs. Mullen as a Result of the Defalcation while Acting in a Fiduciary Capacity?

Having established that the Debtor owed fiduciary duties *vis-a-vis* the Ex-Mrs. Mullen that meet the standards of Section 523(a)(4) of the Bankruptcy Code, and that he willfully neglected those duties (*i.e.,* committed defalcation), the court now turns to what amount of debt the Debtor owes to the Ex-Mrs. Mullen as a result. To the extent there is any doubt regarding this court's authority to calculate damages in this type of context, such doubt should be considered resolved—once again—by the *Bennett* case. *Bennett*, 989 F.2d at 791 ("It is customary for a bankruptcy court to determine both liability and the measure of damages in a proceeding to determine dischargeability of debt") (citations omitted). Texas law recognizes damages awards for breach of fiduciary duties owed to limited partners. *See generally McBeth,* 565 F.3d at 178 and *Bennett*, 989 F.2d at 791.

The *Bennett* case contains a discussion of permissible damages. *Bennett,* 989 F.2d at 790-91. The *Bennett* case noted that, under Texas law, restitution (for the amount of the limited partner's investment) is one permissible method for recovery for a managing partner's breach of a fiduciary duty to limited partners. *Id.* But

---

Ms. Moock and Ms. Smyth received commissions through Seaminx. The court finds a lack of candor, on the part of the Debtor, but not outright fraudulent intent. But, again, fraudulent intent does not matter here. The "mental culpability" requirement is mere "recklessness." *Schwager,* 121 F.3d at 185.

it is not the only method of recovery. *Id.* Actual damages (including lost profits) are also available, as is a suit for accounting or exemplary damages. *Id.* at 791. In *Bennett*, the court ultimately determined that the obligation to be excepted from discharge was equal to the sums misappropriated by the debtor from partnership funds. Specifically, recall that in *Bennett*, the debtor was a general partner of the general partner of a limited partnership that owned a Marriott hotel. The debtor had improperly charged to the partnership: (a) certain mildew repairs ($72,000) that were required to be paid by the general partner under the partnership agreement; and (b) certain hotel equipment leases ($832,204.40) that should have been paid from a construction budget. In addition to this $904,204.40 of misapplied funds, the debtor also made a $1 million cash distribution to himself out of partnership funds which he thought he was entitled to for completing the hotel-project under-budget. In all, this was $1,904,204.40 of defalcations and the court concluded that this was the proper amount of damages that were caused to the limited partnership.[120]

The court concludes here that the appropriate method to

---

[120] The court would note that the final judgment in *Bennett* was amended in a subsequent opinion by the Fifth Circuit. *See LSP Inv. P'ship v. Bennett (In re Bennett)*, No. 91-1059, 1993 WL 268299 (5th Cir. 1993). However, this amendment was merely to alter the final damages award to coincide with the partnership interest that the plaintiffs in *Bennett* actually possessed in the limited partnership (28.4375%). *Id.* Thus, the final judgment owing to the limited partners was $541,508.13 ($1,904,204.40 multiplied by 28.4375%).

calculate damages is the same method applied in *Bennett*—damages based simply on misappropriated partnership funds. For one thing, loss of partnership investment seems impractical here, since the Ex-Mrs. Mullen essentially put "sweat equity" (*i.e.,* the provision of modeling services and related consultation) into Simple Beaute and not a significant monetary investment.[121] Additionally, although the Ex-Mrs. Mullen has asked for lost profits, and the court heard significant expert testimony in that regard, the court concludes it does not have sufficiently reliable evidence to calculate damages of lost profits. "In Texas, lost profit damages must be established with reasonable certainty." *McBeth*, 565 F.3d at 176-77 (citing *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006), *cert denied*, 549 U.S. 817 (2006)). Lost profit damages may not be based on evidence that is "speculative, uncertain, contingent, or hypothetical." *Id.* While some uncertainty as to the amount of damages is permissible, uncertainty to the fact of damages will defeat recovery." *Id.*

Here the most reliable evidence of defalcations/misappropriations is the expert testimony and report of Sibley, who very credibly outlined what he and his team of forensic accountants (after more than 1,000 hours of research) had

---

[121] The court acknowledges that there was some compelling evidence from expert witness, Travis Keath, suggesting that the fair market value of the Ex-Mrs. Mullen's interest in Simple Beaute was diminished due to the Debtor's conduct, but the court does not believe that this, or lost profits, was conclusively proved through the expert report and testimony and, thus, will not reward damages under this theory.

determined were improper personal expenditures of Simple Beaute funds by the Debtor, Mr. McFadin, Ms. Moock and Ms. Smyth. Sibley put together a list of alleged expenses/expenditures that he believed were "improperly" charged to Simple Beaute between the years 2001-2006 (totaling $1,570,551.27, which included $4,130.17 attributable to the Ex-Mrs. Mullen),[122] not to mention others that he believed were "questionable." Additionally, Sibley's list highlights an account receivable owed by the Debtor to Simple Beaute, booked in the amount $142,769.40, which was never repaid, and the evidence reflected that this receivable was comprised of personal expenditures of Simple Beaute funds made by the Debtor. Many (if not most) of these expenditures were unabashedly corroborated by the testimony of the Debtor, Ms. Moock and Ms. Smyth (they do not deny them—they simply profess to believe they did nothing wrong). The court believes that the Sibley testimony

---

[122] Recall that approximately $32,000 of personal charges were made by the Ex-Mrs. Mullen to her Simple Beaute American Express business card during the life of the Partnership, but many of these charges were treated as partnership draws and not as business expenses. The court understood that the $4,130.17 identified by Sibley as Ex-Mrs. Mullen "improper" charges were those that were improperly classified as business expenses (rather than partner draws) of Simple Beaute. Moreover, the court would opine that the remainder of the Ex-Mrs. Mullen's American Express charges are likely included in the remaining "unknown" category which is comprised of $138,774.77 worth of improperly classified business expenses which Sibley could not properly trace to a particular individual due to lacking documentation in the business records of Simple Beaute. See Plaintiffs' Exhibit 172. However, since there was not enough evidence to determine if the Ex-Mrs. Mullen's additional credit card charges were, by a preponderance of the evidence, all accounted for in Sibley's total amount for "improper" expenditures, the court will reduce the Ex-Mrs. Mullen's damages by the total amount of American Express charges she made which were not identified as a partnership draw in the Simple Beaute business records.

and report show, by a preponderance of the evidence, that at least **$1,713,320.67** of funds of Simple Beaute ($1,570,551.27 plus $142,769.40) were misappropriated by or with the consent of the Debtor and to the detriment of the Ex-Mrs. Mullen. These were misappropriations by the Debtor, Mr. McFadin, Ms. Moock, and Ms. Smyth. The Fifth Circuit has stated that Section 523(a)(4) of the Bankruptcy Code is "intended to reach those debts incurred through abuses of fiduciary positions and the debts that have arisen from the debtor's acquisition or use of property that is not the debtor's." *Miller,* 156 F.3d at 602 (citing *Boyle v. Abilene Lumber, Inc.* (*In re Boyle*), 819 F.3d 583, 587-88 (5th Cir. 1987)). Accordingly, the court concludes, based on the Plaintiffs' forensic accountant's analysis,[123] that the Debtor directly misappropriated money of Simple Beaute totaling **$1,713,320.67,** and that the Ex-Mrs. Mullen, being a 38.61% limited partner, was thus damaged in the amount of **$661,513.11 ($1,713,320.67 multiplied by 38.61%).** However, the court will offset this amount by $26,566.45, representing the personal charges made by the Ex-Mrs. Mullen during the life of Simple Beaute on her American Express business card that were not booked as a partnership draw (approximately $21,566.45 [$32,459.72 minus $10,893.27]) as well as an additional $5,000 account receivable (representing a check made out to the Ex-

---

[123] Plaintiffs' Exhibit 172.

Mrs. Mullen that was never repaid to Simple Beaute.)[124]  Therefore, the Ex-Mrs. Mullen is entitled to a judgment against the Debtor in the amount of **$634,946.66, plus $100,000 of exemplary damages (explained below) for a total judgment amount of $734,946.66, plus reasonable attorney's fees, costs and expenses.**  With regard to the latter, these are reimbursable to the Ex-Mrs. Mullen, pursuant to at least paragraph 12.8 of the Partnership Agreement between her and the Debtor, and pursuant to Chapter 38 of the Tex. Civ. Prac. & Rem. Code.[125]

---

[124] The court is treating these expenditures on a parity with the Debtor, Ms. Moock, and Ms. Smyth—although the facts surrounding her personal expenditures seem very different to the court—in that she offered to pay the funds back, and the Debtor declined and treated most of her expenditures as partner draws.

[125] It should be noted that the Debtor has argued that any claims otherwise allowable to the Ex-Mrs. Mullen should be deemed barred by the defenses of statute of limitations, waiver, estoppel, laches, ratification, the business judgment rule, unclean hands, and in pari delicto, or offset.  The evidence does not support such defenses.

As to the defense of statute of limitations, the court concludes that limitations were tolled by the discovery rule, the fraudulent concealment rule and the continuing tort doctrine and that the Ex-Mrs. Mullen timely asserted her claims.  The court also concludes that limitations were tolled on her claims when she filed suit on them in the state court lawsuit on March 27, 2007, and that limitations were further tolled by the Debtor's bankruptcy filing on November 20,2008.

The Ex-Mrs. Mullen's claims against the Debtor did not accrue until at the earliest, January, 2007, when the Ex-Mrs. Mullen first discovered facts giving rise to her claims.  The discovery rule defers the time a cause of action accrues (and the time that the limitation period begins) to the date that the injury is actually discovered.  While the discovery rule usually starts the limitations accrual date when the injury should have been discovered if the plaintiff had exercised reasonable diligence, if the injury is not yet known, this rule does not apply to this case because the Ex-Mrs. Mullen's claims arise out of fiduciary relationships.  Because the Debtor was a fiduciary, the Ex-Mrs. Mullen is excused from having to exercise reasonable diligence into the Debtor's actions or proving that she should have known about the injuries she was suffering at the hands of the Debtor.  *See S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996).  The Debtor's breaches of fiduciary duty were inherently undiscoverable given that the Ex-Mrs. Mullen, as the one to whom a fiduciary duty was owed, was not responsible for having to diligently inquire into the fiduciaries' conduct so long as the fiduciary relationship

### iv. Exemplary Damages.

Last on the topic of Section 523(a)(4) damages, the court will mention that the Ex-Mrs. Mullen made a request for exemplary damages. A breach of a fiduciary duty being a tort, Texas courts have held that exemplary damages may be recoverable for such a breach. *Murphy v. Canion*, 797 S.W.2d 944, 949 (Tex. App.—Houston

---

existed. Throughout the time frame starting in 2001 and continuing to the date of the filing of the Ex-Mrs. Mullen's Complaint, the Debtor and the Corporate GP have been fiduciaries and have owed a fiduciary duty to Simple Beaute and to Simple Beaute's partners. As such, even though the Debtor's misdeeds started as far back as 2001, the injuries the Debtor caused by virtue of his breaches of fiduciary duty were inherently undiscoverable at the time they occurred. Therefore, the Ex-Mrs. Mullen is entitled to recover damages as far back as the Debtor's mismanagement and misdeeds go, or as far back as 2001.

The Ex-Mrs. Mullen's claims are likewise timely, given the Debtor's fraudulent concealment, which estops the Debtor from relying on the statute of limitations as a defense to the Ex-Mrs. Mullen's claims. The tolling of limitations based on the Debtor's fraudulent concealment applies to the Ex-Mrs. Mullen's various tort claims and to her breach of contract claim. The Debtor knew that he was misappropriating Simple Beaute's assets, and the Debtor concealed his misdeeds by falsely reporting personal expenses as business expenses. The Ex-Mrs. Mullen reasonably relied on the Debtor's deception, based on the faith and trust she was entitled to place in the Debtor and the Corporate GP as fiduciaries. Similarly, because the Debtor and the Corporate GP were each under a duty to make disclosures to Simple Beaute and its partners, but instead concealed their breaches of fiduciary duty from the Ex-Mrs. Mullen, the Debtor is estopped from relying on the defense of limitations until the Ex-Mrs. Mullen learned of the right of action or should have learned of the right through the exercise of reasonable diligence. In this case, the Ex-Mrs. Mullen first discovered the misappropriations and her rights regarding the other causes of action in January of 2007.

Additionally, based on the "continuing tort doctrine," the Ex-Mrs. Mullen's tort causes of action did not accrue until March of 2007. A continuing tort involves wrongful conduct inflicted over a period of time that is repeated until desisted, and each day creates a separate cause of action. A cause of action for a continuing tort does not accrue until the defendant's tortious act ceases. In this case, the Debtor's tortious conduct ceased only after the Ex-Mrs. Mullen filed suit in the state court lawsuit in March, 2007. Thus, the Ex-Mrs. Mullen's causes of action based on the Debtor's continuing torts, did not accrue until March, 2007.

As for the defense of *in pari delicto* raised during closing arguments at Trial, the court concludes that this defense was not pleaded and should not be considered as part of this ruling.

1990, no pet.). "Exemplary damages are recoverable when the injury is tainted with fraud, malice, or willful wrong." *Id.* (citing *Cole v. Tucker*, 6 Tex. 266 (1851)). The *Murphy* court (which was analyzing the propriety of a jury award of exemplary damages, in the context of a real estate partnership and alleged breaches of fiduciary duty) further stated that the "issue concerning exemplary damages for breach of fiduciary duty is not whether there is an intent to injure, but rather whether the one with a fiduciary duty intended to gain an additional benefit for himself. *Id.* (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 583-584 (Tex. 1963)). *Murphy* elaborated that malice is not required, so long as there was an intentional breach of fiduciary duty and, moreover, exemplary damages would be proper where "a fiduciary has engaged in self-dealing." *Murphy,* 797 S.W.2d at 949. Moreover, it has been said that it is consistent with equitable principles for equity to exact of a defaulting corporate fiduciary an additional exaction for unconscionable conduct. *Int'l Bankers*, 368 S.W.2d at 584.

It is also appropriate to consult the Texas Civil Practice and Remedies Code's provisions regarding exemplary damages (which post-date the *Murphy* decision). These provisions provide that exemplary damages may only be awarded if a claimant proves by clear and convincing evidence that the harm to the claimant resulted from actual fraud (not constructive); malice (meaning specific intent by

the defendant to cause substantial injury) **or** gross negligence (meaning the act committed involved an extreme degree of risk concerning the magnitude of potential harm, the actor had subjective awareness of the risk, and nevertheless went forward with "conscious indifference to the rights, safety or welfare of others"). Tex. Civ. Prac. & Rems. Code §§ 41.001 & 41.003 (West 2003). To be sure, this is a quite high standard.

While the court concludes there was no malice or fraudulent intent on the part of the Debtor here, the court **does** conclude that the evidence was clear and convincing that the Debtor's breach of fiduciary duties did reach the level of **gross negligence**.[126] There was an obvious risk of harm to the Ex-Mrs. Mullen (she had an expectation that she would receive distributions of her fair share of profits), and the Debtor's binge-spending posed an extreme degree of risk that she would not receive any distribution of profits (and, in fact, she did not). The Debtor had a subjective awareness of the risk, and nevertheless went forward with conscious indifference to the Ex-Mrs. Mullen's rights. While the court does not believe that the Debtor had the specific intent to injure the Ex-Mrs. Mullen, the Debtor did, in this court's view of the

---

[126] Earlier herein, the court, in analyzing whether there was a "defalcation" committed by the Debtor, stated that the Debtor willfully (*i.e.*, at least recklessly—per the Fifth Circuit's standard in *Schwager*) neglected his fiduciary duties. The court must now analyze the conduct of the Debtor within the framework of the exemplary damages statute—wherein "gross negligence" appears to be the minimum of the defined standards.

credible evidence, intend to gain an additional benefit for himself (and his domestic partner and friends) and unconscionably self-dealt by treating Simple Beaute's funds as his own to do with as he pleased. The court determines that the exemplary damages that should be awarded against the Debtor in favor of the Ex-Mrs. Mullen are $100,000.

### B.    *Inapplicability of Section 523(a)(2)(A).*

The Ex-Mrs. Mullen has additionally argued that her debt owed from the Debtor should be excepted from discharge pursuant to Section 523(a)2)(A) of the Bankruptcy Code. While this court has already held that the Ex-Mrs. Mullen's debt should be excepted from discharge under Section 523(a)(4), the court will nevertheless address this alternative form of relief.

Section 523(a)(2)(A) provides that:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for money, property services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

In order to prove that, pursuant to section 523(a)(2)(A) of the Bankruptcy Code, a debt is non-dischargeable as obtained through fraud, the creditor must show (1) that the debtor made representations other than a statement concerning his financial condition, (2) that at the time the debtor made the

representations, he knew they were false, (3) that the debtor made the representations with the intention and purpose to deceive the creditor, (4) that the creditor justifiably relied on such representations, and (5) that the creditor sustained losses as a proximate result of the false representations. *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005); *RecoverEdge L.P. v. Pentecost*, 44 F.3d. 1284, 1293 (5th Cir. 1995); *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131 (Bankr. N.D. Tex. 2005). "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required." *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001). Misrepresentations may also be made through conduct. *Id.* However, "[d]ebts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud 'involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'" *Provident Bank v. Merrick (In re Merrick)*, 347 B.R. 182, 186 (Bankr. M.D. La. 2006) (citing *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)). Intent to deceive may be inferred from "a reckless disregard for the truth or falsity of the statement combined with sheer magnitude of the resultant misrepresentation." *Acosta*, 406 F.3d at 372. "Intent of a kind sufficient to preclude discharge for debt for money obtained by debtor's false pretenses, false representation or actual fraud may be inferred where a debtor makes

a false representation and knows or should know that the statement will induce another to act." *Hurst*, 337 B.R. at 133.

In evaluating a cause of action under section 523(a)(2)(A) of the Bankruptcy Code, whether it is a question of false pretenses or of false representation or of actual fraud, the court must determine that the plaintiff justifiably relied upon the representations made by the defendant. *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance does not require independent investigation of the facts as presented, but a plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he used his sense to make a cursory examination. *Id.* at 69-71. Justifiable reliance is not a "reasonable man" standard, but is a lesser standard than reasonable reliance (which is a statutory element of section 523(a)(2)(B) of the Bankruptcy Code). *Id.* at 77.

Here, the court does not believe Section 523(a)(2)(A) of the Bankruptcy Code squarely fits the wrong that the Ex-Mrs. Mullen suffered. While it is hard to decipher from the Ex-Mrs. Mullen's First Amended Complaint and case-in-chief, it appears that she argues that the "false representations" made to her were the representations in the Partnership Agreement that profits would properly be distributed to partners quarterly, and then the later false representations to her that there were no profits. Additionally, false representations were made in the Partnership

Agreement that only reasonable business expenses would be charged to Simple Beaute and that no salaries would be taken (and, in fact, this is not what happened in reality). While things certainly did not turn out the way they should have or were, perhaps, represented, the court does not believe that specific false statements were made that created losses to the Ex-Mrs. Mullen as a proximate result of the false representations. It is unclear how many times or when the Debtor may have actually told the Ex-Mrs. Mullen that Simple Beaute was not making a profit. The evidence was less than clear on this. Moreover, it was really **the misappropriation of funds** that led to losses to the Ex-Mrs. Mullen **rather than any false representations**. This is not the situation where a lender makes a loan or extends or renews credit as a result of false statements that were made by a borrower. In summary, Section 523(a)(2)(A) does not appear to apply to bar the discharge of the debt owed to the Ex-Mrs. Mullen.

*C.* *Should the Debtor Globally Be Denied a Discharge Pursuant to Section 727 of the Bankruptcy Code?*

As mentioned early on, both Mr. Mullen and the Ex-Mrs. Mullen have urged that the Debtor should be denied any discharge at all, pursuant to various provisions of Section 727.[127]

---

[127] The court has spent a great deal of time determining what the claim amount of **the Ex-Mrs. Mullen** is against the Debtor. It should be noted that the Debtor made the argument at Trial that Mr. Mullen was not himself a creditor, because the principal of the loan Mr. Mullen made to the Debtor was repaid and Mr. Mullen agreed orally to forgive the interest. The court did not find the uncorroborated oral testimony of the Debtor as to the alleged forgiveness by Mr. Mullen of the interest on his loan credible. Moreover, Mr. Mullen

For any action under Section 727, "the burden of proof falls on the creditor to prove that the case falls within one of the Section 727(a) exceptions by a preponderance of the evidence."[128] *Neary v. Jordan (In re Jordan)*, No. 05-86647, 2006 WL 3240143, at *6 (Bankr. N.D. Tex. Nov. 21, 2006) (citing *Grogan v. Garner*, 489 U.S. 279, 286 (1991)).

### i. Objection to Discharge Based on Section 727(a)(2)(A).

Section 727(a)(2)(A), provides in pertinent part that:

(a) The court shall grant the debtor a discharge, unless . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed --

(A) property of the debtor, within one year before the date of the filing of the petition . . .

---

actually obtained a partial summary judgment in a state court action prepetition, in the amount of $175,478.34, against the Debtor, representing Mr. Mullen's claim through January 1, 2006, but the state court judge reserved for trial the amount of indebtedness (interest and attorney's fees) accruing subsequent to such date. This court will hold an evidentiary hearing hereafter (to the extent requested by Mr. Mullen) to determine the exact liquidated amount of Mr. Mullen's claim, since the court has determined herein that the Debtor will not receive a discharge. It appears that the court would need to liquidate interest and reasonable attorney's fees that Mr. Mullen appears able to assess pursuant to the note and the Texas Civil Practice and Remedies Code. Such hearing can occur simultaneously with the hearing to determine the Ex-Mrs. Mullen's attorney's fees. Last, the court would add that it also concludes that Mr. Mullen's claims are not barred by the defenses asserted by the Debtor, including novation, offset/set-off, modification, accord and satisfaction, waiver, laches, estoppel or ratification. Mr. Mullen timely asserted his claims and there is no evidence to support these defenses.

[128] *See also Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

11 U.S.C. § 727(a)(2)(A) (2010). In order to establish that a debtor's general discharge should be denied pursuant to Section 727(a)(2)(A) of the Bankruptcy Code, the moving creditor must show: (1) a transfer or concealment of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; and (4) with intent to hinder, delay or defraud a creditor or officer of the estate. *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005) (citing *Pavy v. Chastant (In re Chastant)*, 873 F.2d. 89, 90 (5th Cir. 1989)). "The intent to defraud must be actual, not constructive." *Id*. However, "actual intent may be inferred from the actions of the debtor and may be proved by circumstantial evidence." *Id.*

As to the first factor, concealment of property can be established by showing a transfer of title to property coupled with the retention of the benefits of ownership. *See Bradley v. Ingalls (In re Bradley)*, 501 F.3d 421, 434 (5th Cir. 2007) (citing *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 553 (5th Cir. 1987)). Harm to the creditor is not a required element to prosecute an action under Section 727(a)(2) of the Bankruptcy Code. *See Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000). "Concealment includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known." *Peterson v. Scott (In the Matter of Scott)*, 172 F.3d 959, 967 (7th Cir. 1999) (citing

-84-

*United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir. 1984)).
Failure to schedule assets on the debtor's schedules if done with
intent to defraud creditors is a concealment that will bar
discharge. *See In re Crabtree*, 59 F. Supp. 731, 732 (D. Ct. W.D.
Va. 1944), *aff'd*, 148 F.2d 524 (4th Cir. 1945). Failure to
schedule a debt on the debtor's schedules can also support a
denial of discharge under Section 727(a)(2). *See In re
Rosenzweig*, 239 B.R. 905, 910 (Bankr. N.D. Ill. 1999).

As to the timing issue, a transfer of an asset more than one
year before the filing of bankruptcy may be the basis for a
denial of a discharge under Section 727(a)(2)(A) of the
Bankruptcy Code if the debtor continues during the one year
period before the filing to conceal his hidden interest in the
asset. *In re Olivier*, 819 F.2d at 555 (5th Cir. 1987). Under
the continuing concealment rule, a debtor's transfer of legal
title to property prior to one year before the bankruptcy
petition date, coupled with a retention of certain attributes of
beneficial ownership into the one-year reach-back period of
Section 727(a)(2)(A), can constitute a "concealment" under
Section 727(a)(2)(A) of the Bankruptcy Code.[129] *See id.* at 553.

The Fifth Circuit has set forth factors that may show actual
intent to defraud such as: (i) inadequate consideration; (ii) the

---

[129] *See also In re Rosen*, 996 F.2d 1527, 1531-32 (3d Cir. 1993); *In re
Kauffman*, 675 F.2d 127, 128 (7th Cir. 1981).

family, friendship or close association between the parties; (iii) the retention of possession, benefit or use of the property in question; (iv) the financial condition of the party sought to be charged both before and after the transaction in question; (v) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (vi) the general chronology of the events and transactions under inquiry. *Pratt*, 411 F.3d at 565; *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 702 (5th Cir. 2003). "[M]oreover, a presumption of fraudulent intent [attaches] when a debtor transfers property to relatives." *Pratt*, 411 F.3d at 565-66. "[O]nce this presumption attaches, the burden shifts to the debtor" to show that there was no fraudulent intent. *Id.* at 566.

On the topic of whether the Debtor transferred, removed or concealed property of the Debtor (or permitted to be transferred, removed, or concealed property of the Debtor) within one year of the date of the bankruptcy, with the intent to hinder, delay or defraud Mr. Mullen, the Ex-Mrs. Mullen, and his other creditors, here is the reality reflected in the evidence:

> (a) Until a few months before the Debtor filed bankruptcy in November 2008, the Debtor was the 51% equity owner of Simple Beaute. What was Simple Beaute? Simple Beaute was an active, revenue-generating company that was the publisher and distributor of books, videos and cosmetic products. Simple Beaute and its products were the creation of the Debtor (through some assistance from the Mullens).

-86-

(b) It is unclear from the evidence exactly **when** activity in Simple Beaute ceased and when transfers of its assets, opportunities, and values away from Simple Beaute occurred (the Debtor testified that it was sometime in 2008). But the evidence was that HCM was formed in July 2007 (roughly 16 months before the Debtor's bankruptcy case was filed and six months after the Mullens sued the Debtor); then in February and March 2008, the Debtor's domestic partner filed assumed name certificates with the Texas Secretary of State and the Dallas County Clerk, claiming the trade name "Robert Jones Beauty"[130]; and then the Debtor's domestic partner shut down Simple Beaute's website and opened a new website entitled "Robert Jones Beaute"[131] (which website promotes some of the same products as did the website of Simple Beaute). Without a doubt, **HCM now has the identical business concept as Simple Beaute**. HCM is purportedly 100%-owned by the Debtor's domestic partner. Simple Beaute was 51%-owned by the Debtor.

(c) While Simple Beaute's true profitability and value have been impossible to ascertain, due to the historical, reckless-spending of its earnings by the Debtor and his friends, the evidence did show that Simple Beaute earned, from May 18, 2001 to July 22, 2007, gross revenue of $6,150,989.02, and subtracting cost of goods sold, had a gross profit of $4,798,605.80. This is not insubstantial sales revenue—particularly for a start up business. Moreover, now the Debtor has widespread name-recognition, achieved not merely from his talent and charisma, but largely due to the financial backing from the Mullens, that allowed the Debtor to get his name and products into the marketplace. If Simple Beaute generated this level of revenue when it was merely self-publishing books and the Debtor had merely an evolving name recognition, it seems reasonable to infer that Simple Beaute (now HCM) would have more revenue-earning potential at this time than ever—since Simple Beaute had risen (before its cessation-of-business by the Debtor) to the point of publishing books through a professional book publisher, and the Debtor has widespread name-recognition, after hundreds of public appearances in the last few years.

---

[130] *See* Plaintiffs' Exhibit 24 & Plaintiffs' Exhibit 28.

[131] *See* Plaintiffs' Exhibit 25.

(d) The further reality is that Simple Beaute, of which the Debtor owned 51%, was to own (according to the Debtor's original proposal to Mr. Mullen) "exclusive rights to all print media, electronic media, catalogue business, seminars and workshops devoted to Simple Beaute product lines, and the promotion thereof." Now, instead of the Debtor owning a 51% equity-interest in all of this, HCM (owned by the Debtor's domestic partner) purports to own all of this.

(e) The further reality is that Simple Beaute published five books (and DVDs): (i) "Beaute Made Simple" (self-published in 2002, with Simple Beaute registering the word mark "Beaute Made Simple" with the USPTO); (ii) "Robert Jones Simple Beaute" (self-published in 2004); (iii) "Robert Jones Beaute Occasions: Bridal Beaute and Beyond" (self-published in 2004); (iv) "Makeup Makeovers: Expert Secrets for Stunning Transformations" (published in 2005 by Fair Winds Press); and (v) "Makeup Makeovers: Weddings-Stunning Looks for the Entire Bridal Party" (published in 2006 by Fair Winds Press). The evidence at Trial was that these last two books are still on book store shelves with there being at least some possibility of continuing royalties (particularly with "Makeup Makeovers").

(f) The further reality is that, although Simple Beaute was dissolved (or at least discontinued informally) unilaterally by the Debtor at some point in 2008 (without any consent, involvement of, or accounting to the Ex-Mrs. Mullen), the Debtor's Bankruptcy Schedules and Statement of Financial Affairs do not disclose this significant fact. Rather, the Schedules simply list the Debtor's 51%-interest in Simple Beaute as having an "unknown" value. And the Debtor's Schedules and Statement of Financial Affairs do not reveal that there is now a business owned by the Debtor's domestic partner, called HCM, that essentially took all of Simple Beaute's goodwill, intellectual property, other assets and business model. Again, the reality is that, now, the business of Simple Beaute is all being transacted through HCM. Instead of the Debtor owning 51% percent of the fruits and equity of Simple Beaute (which would go the Debtor's Chapter 7 Trustee for the benefit of creditors), the Debtor's domestic partner owns 100% of the fruits and equity of HCM. The only mention of HCM in the Debtor's Bankruptcy Schedules is not explicit, and not at all

candid about the reality; specifically, at the bottom of the Debtor's Schedule I, there was a "Note" that stated that "Debtor's partner owns a fledgling company that was launched in July of 2008, and he has not drawn ever drawn [sic] a salary from the company. The company does however pay the partner's car payment and other miscellaneous expenses." Again, HCM itself is not specifically mentioned by name (nor is it mentioned that HCM was transferred all of Simple Beaute's rights, property and business model—of which the Debtor owned 51%). The Debtor's Schedule I also merely describes the Debtor as an employee (for 8 years) with Seaminx as a hair and makeup artist. One might easily infer from the Debtor's Schedules that the Debtor was back to his "old days" pre-Simple Beaute, of just doing hair and makeup.

(g)  If there was any doubt that the Debtor has transferred to HCM all of the rights, concepts and value of Simple Beaute (of which he was 51% equity owner), such doubt should be eliminated by the knowledge that, since HCM's inception (in 2008), it has published two books (through Rockport Publishers, a Fair Winds Press company), one of which is entitled "Ultimate Makeovers" and is nothing more than a combination of books #4 and #5 of Simple Beaute (the two "Makeup Makeovers" books). And, while Simple Beaute sold its books, DVDs, and other products in a variety of fora, including sales through Simple Beaute's own internet website (www.simplebeaute.com), Amazon.com, retail bookstores, seminars, and workshops, now HCM sells the same concepts and products through these same avenues and through a new website **www.robertjonesbeauty.com.**

(h)  HCM also leases Simple Beaute's old office space.

Is this all the transfer, removal or concealment of property of the Debtor in the year before bankruptcy? The court concludes "yes." While it is true that there was really a transfer, removal and concealment of *Simple Beaute* property to HCM, the Debtor had a 51% equity ownership in Simple Beaute. And the Debtor exclusively controlled Simple Beaute. The Debtor, in

-89-

essence, conveyed away to his domestic partner **his controlling, majority interest in Simple Beaute** (and/or **his right, upon dissolution of Simple Beaute, to 51% of its value**).  There was property of the Debtor involved.  Was there an intent to deceive or thwart creditors?  Yes.  The Mullens sued the Debtor, and suddenly a new company is formed that is out of their reach.  The requisite intent can be easily inferred here.  While the time frames are fluid (beginning slightly more than a year before the bankruptcy filing) the concealment continued into the year before the bankruptcy and even **after** the bankruptcy—by virtue of the disingenuous Bankruptcy Schedules that simply listed the Debtor's 51% ownership interest in Simple Beaute, reflecting it as having an "unknown" value, and meanwhile referencing obtusely at the bottom of Schedule I that the Debtor's domestic partner owned a "fledgling" company formed in July 2008 that paid some "miscellaneous expenses."

The Debtor seems to suggest in testimony and argument that his name is his to exploit—not Simple Beaute's or anyone else's—and/or that **he** is the one with value not **his name.**[132] The reality

---

[132] In this case, the Debtor's right to his name and the publicity attendant thereto are assets that are protected under the law.  For example, the tort claim of invasion of privacy protects against the misappropriation of name and right of publicity.  *See* RESTATEMENT (SECOND) OF TORTS § 652C cmt. a (1977).  Texas courts recognize the tort claim of appropriation of name.  *See Express One Int'l v. Steinbeck*, 53 S.W.3d 895, 900 (Tex. App.—Dallas 2001, no pet.).  This cause of action protects the value associated with the name, which includes reputation, prestige, social or commercial standing.  *Id.* at 900.  Moreover, Texas courts have gone so far as to declare that an individual has a property right in the use of his name after death and that this property right

is, the Debtor agreed that certain intellectual property and opportunities would be owned by Simple Beaute, and that the Ex-Mrs. Mullen would be entitled to 38% of the value which it generated and the Debtor (and ergo his general creditors) would be entitled to 51% of the value which it generated. The Debtor has schemed with his domestic partner to thwart that reality. The Debtor still, in fact, realizes the benefit of the assets and value, through his close relationship with HCM/Mr. McFadin. This is the very type of transaction that Section 727(a)(2) is designed to address.

The court concludes that the Debtor, with an intent to hinder, delay or defraud his creditors or an officer of his bankruptcy estate charged with custody of property under the Bankruptcy Code, has transferred, removed or concealed, or has permitted to be transferred, removed or concealed, property of the Debtor within one year before the date the Debtor filed his bankruptcy petition and after his petition was filed. The court also finds that the Debtor has concealed this transfer and concealment of an asset that occurred more than one year prior to his bankruptcy filing, thereby allowing the court to rely on such act in denying him a discharge under Section 727(a)(2) of the

is freely transferable and may be transferred before or after death. See Tex. Prop. Code Ann. § 26.001, et seq (West 2010). The Texas Legislature implied that a property right in an individual's name exists before death since Section 26.014 states Chapter 26 does not affect "a right an individual may have in the use of the individual's name … before the death of the individual." *See* Tex. Prop. Code Ann. § 26.014 (West 2010).

Bankruptcy Code.

### ii. *Objection to Discharge Based on Section 727(a)(4)(A).*

The bankruptcy schedules and statement of financial affairs of a debtor serve a vital role for creditors in a bankruptcy case, in that they ensure that adequate and truthful information is available to trustees and creditors, not just an objecting creditor, without the need for further investigation to determine whether or not the information is true and correct. *See Beaubouef*, 966 F.2d at 177-178. To bar a debtor's discharge under Section 727(a)(4)(A) of the Bankruptcy Code, a creditor has the burden of proving that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent to deceive; and (5) the statement related materially to the bankruptcy case. *Id.* at 178. In evaluating whether this court should deny a discharge based on omissions from the Debtor's schedules, the court should consider the number of omissions, the types and significance of the omissions, the sophistication and overall attitude and approach of the Debtor, and other facts and circumstances that might be relevant to discern the Debtor's state of mind. *See In re Moore*, Adv. No. 06-3451, 2007 WL 1474289, at *8 (Bankr. N.D. Texas May 18, 2007).

The court finds and concludes, by a preponderance of the evidence, that the Debtor knowingly and fraudulently made a false

-92-

oath in his case, by virtue of some initial omissions of certain
property in his Bankruptcy Schedules, including intellectual
property, and the Debtor's failure to make appropriate
disclosures regarding HCM.  While HCM is technically owned by the
Debtor's domestic partner, the Debtor clearly has rights in (and
enjoy the benefits of) its assets, value and operations.

Turning to the Debtor's Schedules, the original set of
Schedules were filed on December 8, 2008.  Among other things,
the Schedules listed that the Debtor owned $11,115 worth of
household goods and furnishings[133] (mostly furniture; no
collectibles); $1,900 worth of clothing; a $300 camera; $1,500 of
Makeup Tools and Supplies; $1,600 of Hair Supplies;[134] and jewelry

---

[133] The court notes, from the Debtor's Schedule A, that he lives in a home with
an estimated value of $460,000; $11,115 worth of furnishings in house of this
value seems somewhat low to the court.

[134] While the Plaintiffs have not called into question the values placed on the
Debtor's clothing ($1,900) and hair and makeup supplies ($3,100), the court
cannot help but have the nagging feeling that these estimates are likely far
too low (as with the $11,115 of household furnishings).  According to Simple
Beaute's books and records, more than **$186,000.00** of Simple Beaute's funds
were spent on "wardrobe and props."  *See* Plaintiffs' Exhibit 160(84).  The
Debtor testified that wardrobe and props were necessary for photo shoots
related to Simple Beaute's books, videos and DVDs and that he still has some
props and wardrobe belonging to Simple Beaute at his house, such as jewelry
and dresses of unknown value.  *See* Testimony of the Debtor at Trial on October
20, 2009.  However, there was also testimony from the Ex-Mrs. Mullen and Ms.
Moock that the wardrobe and props for the photo shoots were usually **borrowed**
from various stores, and, thus, the need to **buy** clothing should have been
minimal.  Moreover, the Debtor testified that he purchased suits, shoes, and
other clothes that he claimed were used in personal appearances for the
benefit of Simple Beaute.  There were several charges to Neiman Marcus
classified as "wardrobe and props," many of which individually exceeded
$1,500.00.  *See* Plaintiffs' Exhibit 160(84).  Many of these expenditures appear
to be personal expenditures for the Debtor, including $2,787.17 paid to
Preston Luggage, which the Debtor admitted was for luggage for him and his
assistant to use when they traveled to workshops, as well as expenditures at
Saks Fifth Avenue, Henri Bendel, John Varvatos-NY, Bloomingdales and many
other stores.  *See* Plaintiffs' Exhibit 160(86).  While not a basis for this

of "unknown" value (indicating the Debtor was in the process of obtaining an appraisal and would provide value and specifics within two weeks).  The Debtor also listed ownership interests in the following entities:  Simple Beaute (51%); the Corporate GP (51%); Beaute Now (33.33%); and Compelling Pictures (50%)—all listing the value as "unknown."[135]  Question 20 on the Debtor's Statement of Financial Affairs showed that in October 2008, Mr. McFadin had taken an inventory of Simple Beaute and it had approximately $89,000 of inventory on hand (presumably books and makeup products).  The Debtor listed two copyrights:  one for "Makeup Makeovers" and one for "Makeup Makeovers Weddings" (both stating that the copyrights actually belonged to the publisher and that the Debtor had some sort of reversionary interests in them when the publisher "decides to discontinue publishing").  No possibility of royalties were mentioned—in fact, with regard to "Makeup Makeovers Weddings," the Debtor stated that he "still owes for advances."

In the Debtor's Schedule I, he listed his income as $18,016.14 per month, working as a "Hair and Makeup Artist" for Seaminx Artist Management (listing himself as an employee for

---

court's Section 727(a)(4) holding herein, this court cannot help but believe that the Debtor (even using appropriate fair market values for "used" apparel) has far more than $1,900 of clothing hanging in his closets.  This bears on the credibility of the Debtor, overall, to some degree.

[135] These four entities were also listed in the Debtor's Statement of Financial Affairs at Question 18.

eight years). He listed $3,712 of business expenses a month, including $1,750 for "Apt and office in New York"; $800 for "Equipment and Supplies for Work"; and $1,000 for "Travel & Meal Expenses for Work." As mentioned in an earlier discussion, the Debtor also, at the bottom of Schedule I, stated that "Debtor's partner owns a fledgling company that was launched in July of 2008, and he has not drawn ever [sic] a salary from the company. The company does however pay the partner's car payment and other miscellaneous expenses."[136]

On December 29, 2008, the Debtor filed an Amended Schedule B and C. These clarified or amended the original Schedules as follows: the Debtor clarified that his $11,115 worth of household furnishings were 50% owned by Mr. McFadin; and the Debtor now valued his jewelry at $6,000, including a bracelet, gold band and wedding ring.[137]

Finally, on December 15, 2009 (thirteen months after the bankruptcy case was filed and during Trial) the Debtor amended his Schedule B once again, this time adding five Madame Alexander

---

[136] Note that in the Debtor's Schedule I, he identified himself as "single," and did not list any monthly income being contributed to the household from Mr. McFadin, although Question 16 on the Debtor's Statement of Financial Affairs listed Mr. McFadin as the Debtor's spouse.

[137] Presumably, this jewelry listing included at least one of the wedding bands purchased from Fragments in New York City, for the Debtor and Mr. McFadin, for $36,690, on November 30, 2005, as well as the $6,000 Ylang Ylang bracelet that the Debtor bought for himself to celebrate his first book publishing deal. Again, the court cannot help but be troubled by the values that the Debtor decided to apply to his expensive jewelry and designer clothing. It somewhat bears on his credibility with the court.

dolls (the existence of which was discussed during Trial testimony), and stating now that the Debtor owned three copyrights, not just two (one of which—that for "Looking Younger"—had not been earlier scheduled, which the Debtor indicated that he believed HCM rightfully owned).[138] There was also elaboration regarding the details of the three copyrights. Also the Debtor listed for the first time his three trademarks for "Robert Jones Simple Beaute"–stating that he thought they had $0 value. The Debtor also mentioned the first three books that were self published but were never registered with the U.S. Copyright Office.

Clearly there were omissions in the first set of Schedules filed. The Plaintiffs have complained about the Debtor's failure to correctly and candidly list all intellectual property in which he had rights, the failure to disclose Simple Beaute clothing and jewelry stored at the Debtor's home, the failure to list a lease on the New York apartment that the Debtor or Simple Beaute maintained (and the contents thereof), the failure to list the

---

[138] With regard to the book "Looking Younger" (*see* Plaintiffs' Exhibit 199), recall from the evidence earlier described that, while HCM itself entered into a contract with the Book Publisher, which called for the Debtor to write the book, the Debtor personally guaranteed performance of the publishing contract and in writing represented to the Book Publisher that he had an interest in HCM. *See* Plaintiffs' Exhibits 42-43. Furthermore, under the book publishing contract, the **Debtor was the owner of the copyright** on "Looking Younger" and a copyright was registered with the United States Copyright office in the Debtor's name. *See* Plaintiffs' Exhibit 271. However, the royalty rights were promised to HCM under the publishing contract. *See* Plaintiffs' Exhibit 42. Clearly, there was not adequate disclosure in the Debtor's Schedules (on file for more than a year) about the **Debtor's** interests in his latest book.

collection of dolls, and the failure to disclose an equitable or beneficial interest in HCM. But were these omissions severe enough to preclude a discharge? Looking at the number of omissions, the types and significance of the omissions, the sophistication and overall attitude and approach of the Debtor, and other facts and circumstances that might be relevant to discern the Debtor's state of mind, is there enough of a problem with the Schedules to infer a fraudulent intent to deceive, and was this all material to the bankruptcy case?

The most serious problems with the Schedules, in the court's estimation, are: (a) the failure to disclose the circumstances regarding HCM; and (b) the omission of any information regarding the new book "Looking Younger" and the Robert Jones trademarks. The fact that the Debtor failed to disclose five collector Madame Alexander dolls, likely worth a few hundred dollars, is (while imperfect) hardly material or suggestive of an intent to defraud creditors. Additionally, the fact that the Debtor failed to disclose that he had clothes and jewelry and other props that had belonged to Simple Beaute at his house is, again, imperfect, but may have seemed unnecessary, from the Debtor's and his counsel's perspective, since the 51% ownership interest in Simple Beaute had been scheduled, and this property was not owned by the Debtor, *per se*. Additionally, the failure to list three self-published books that were not registered with the U.S. Copyright

-97-

Office seems innocent enough and not suggestive of fraudulent intent. This is also true as to the original less-than-perfect descriptions of the copyrights on "Makeup Makeovers" and "Makeup Makeover Weddings." But, again, the real problem is with the failure to disclose the circumstances surrounding HCM and the copyrights and trademarks it now purports to own. The fact is that HCM must have some value. Simple Beaute grossed a fair amount of money–even as a "start up." We know Simple Beaute paid for a lot of lavish trips, spa visits, jewelry, clothing, food and beverage. It was, without a doubt, a material omission, in this court's view, that the Debtor did not disclose that he informally dissolved (in the months leading up to his bankruptcy filing) the company in which he owned a 51% interest, that had the right to his name and trademarks and copyrights, that had a website that generated a high volume of sales, and then transferred all of the company's assets, rights and value to his life partner. Rather than disclose this—and let the Trustee and creditors promptly evaluate it for what it was worth—the Debtor never mentioned HCM (merely alluding to his partner owning a nameless "fledgling company" in a note to Schedule I) and, as for intellectual property, merely mentioned two copyrighted books, suggesting in the descriptions thereof that the only one likely to realize any future value from them was a book publisher. We know now that, during the case, the Debtor and/or HCM received a

few thousand dollars of royalties and only turned part of them over to the Bankruptcy Trustee (at least as of the time of Trial). The issue of whether these omissions were material enough to bar a discharge has not been easy—for this Debtor is not as business-savvy as some debtors the court sees. However, the court, on balance, thinks the omission of the details of HCM and certain of the intellectual property was highly problematic. There was a lack of necessary candor. The omissions were material. And the court believes it was intentional—the Debtor hoped HCM and Mr. McFadin could remain untouched and unbothered (out-of-sight and out-of-mind) during the Debtor's bankruptcy case. A lack of forthrightness is one of the very things that Section 727(a)(4) of the Bankruptcy Code is intended to address. Thus, the court will hold, as additional grounds to deny the Debtor's discharge, that the Debtor made false oaths with intent to deceive, pursuant to Section 727(a)(4)(A).

### iii. *Objection to Discharge Based on Section 727(a)(5)*

Section 727(a)(5) of the Bankruptcy Code provides that it is grounds to deny a discharge if the Debtor fails to satisfactorily explain any loss of assets or deficiency of assets to meet the debtor's liabilities. *See* 11 U.S.C. § 727(a)(5) (2010). The objecting party has the burden of proving the objection initially, but once the objecting party has produced evidence establishing a basis for the objection, the burden shifts to the

debtor to explain the loss satisfactorily. *See, e.g., First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 992-93 (5th Cir. 1983). Vague and indefinite explanations uncorroborated by documentation are unsatisfactory. *Id*. The plaintiff must also "make a prima facie showing that the defendant has had a sudden and drastic loss of assets just prior to filing bankruptcy, and upon that showing, the defendant bears the burden to explain satisfactorily any loss of assets. *Neary v. Hughes (In re Hughes)*, Case No. 05-82316-SGJ-7; Adversary No. 06-3263 at 42 (Bankr. N.D. Tex Nov. 6, 2006) (emphasis added) (*citing In re Horridge*, 127 B.R. 798, 799 (S.D. Tex. 1991); *In re Reed*, 700 F.2d 986, 992 (5th Cir. 1983)).

Here, the court concludes that the Plaintiffs have not met their burden on this particular subsection of Section 727 and, thus, this shall not be a basis for denial of a discharge to the Debtor.

## IV. CONCLUSION

Based upon the preponderance of the evidence, the court concludes that the Debtor recklessly disregarded his fiduciary duties owed to the Ex-Mrs. Mullen, by misusing the funds of Simple Beaute for his and other's personal gain. He acted with unconscionable indifference to the Ex-Mrs. Mullen's rights. As a result, the Ex-Mrs. Mullen is entitled to damages for the Debtor's actions and such damages will be excepted from the Debtor's

discharge, pursuant to Section 523(a)(4) of the Bankruptcy Code. Additionally, the court finds that the Plaintiffs have met their burden as to the Section 727(a)(2) and (a)(4)(A) causes of action (concealment of property by the Debtor and material omissions in his sworn Schedules), and accordingly, the Debtor will globally be denied his discharge. It is therefore

ORDERED that the Debtor shall owe a debt to the Ex-Mrs. Mullen in the amount of *$734,946.66, plus reasonable attorney's fees, costs and expenses,* and such debt shall be excepted from discharge, pursuant to Section 523(a)(4) of the Bankruptcy Code. It is further

ORDERED that the Ex-Mrs. Mullen is directed to request a separate evidentiary hearing to prove up reasonable attorney's fees, costs and expenses that shall be added to this nondischargeable debt. It is further

ORDERED that the Debtor shall be denied his general discharge pursuant to Sections 727(a)(2) and (a)(4)(A) of the Bankruptcy Code. It is further

ORDERED that Mr. Mullen is directed to request a separate evidentiary hearing to prove up the exact liquidated amount of his claim (inclusive of interest on interest and reasonable attorney's fees, costs and expenses). It is further

ORDERED that separate judgments (of nondischargeability and denying the Debtor's discharge) will be entered consistent with the

-101-

findings above.

### ###END OF MEMORANDUM OPINION###